803 A.2d 1

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
LESLIE ANN NELSON, DEFENDANT–APPELLANT.

Argued March 12, 2002—Decided July 30, 2002.

418

422

*Jay L. Wilensky* and *Lon C. Taylor,* Assistant Deputy Public Defenders, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney).

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

*Leslie Nelson* submitted a supplemental brief, pro se.

The opinion of the Court was delivered by

ZAZZALI, J.

Defendant Leslie Nelson, formerly known as Glenn Nelson, pled guilty to the killing of two police officers and to the aggravated assault of a third officer. After her first penalty-phase trial, she was sentenced to life in prison for the murder of Officer John McLaughlin and to death for the murder of Officer John Norcross.

This Court vacated defendant's first death sentence because the State withheld evidence that was favorable to the defense and material to the jury's deliberations on the death penalty. *State v. Nelson*, 155 *N.J.* 487, 715 *A.*2d 281 (1998). The matter was remanded for a new sentencing trial on the Norcross murder. After the second penalty-phase trial, which is the subject of this appeal, Nelson again received the death penalty. She now appeals to this Court as of right. *N.J.S.A.* 2C:11–3e.

We find error in the special verdict sheet and in the improper comments made by the prosecution during summation. We therefore reverse the imposition of the death penalty.

## I

## A

Early on the morning of April 20, 1995, Haddon Heights Police Detectives Robert Griffith and Richard Norcross were summoned to defendant's home to assist Investigator John McLaughlin of the Camden County Prosecutor's Office and Carmelo Garcia of the Division of Youth and Family Services (DYFS) in investigating a complaint against defendant. Defendant had been residing in that home with her parents.

Investigators presumed defendant was home because of the presence of her van outside the residence. After initial attempts to contact defendant failed, the two officers requested that a police dispatcher call defendant at home. The dispatcher persuaded defendant to open the front door after telling her the police were there to investigate her van. After the investigators told defendant that they were there to investigate her, defendant appeared "paranoid" and "somewhat afraid." Although defendant initially refused to permit the investigators into the home and communicated with them only through a screen door, defendant ultimately allowed McLaughlin and Garcia into the home. The meeting between defendant and the investigators lasted approximately ninety minutes. The conversation was "generally calm," until

defendant "became emotionally upset," and grew increasingly "paranoid" as the two investigators charged her with wrongdoing and informed her of her rights.

The investigators then requested defendant's consent to search her bedroom. Defendant denied their request. However, defendant's mother allowed the investigators to search the upstairs of the house and defendant permitted the investigators entry into her room. There, they noticed that defendant had been manufacturing homemade bullets. After Investigator McLaughlin engaged defendant in a discussion about guns, defendant admitted to the investigators that she kept a gun in her closet, but would not produce the weapon. As McLaughlin and Garcia exited the home, defendant asked if they planned on returning. After McLaughlin told defendant that he had to check with his superiors, defendant indicated that she would kill herself if taken into custody.

On returning to the Haddon Heights police station, Detective Richard Norcross sought a warrant to search defendant's bedroom for firearms. Specifically, Detective Norcross asked for a "no-knock" warrant, which would allow police to execute the warrant without first notifying defendant of their presence. A municipal court judge granted Detective Norcross' request.

At approximately 2:00 p.m. that afternoon, Detective Norcross, Investigator McLaughlin, and four other Haddon Heights police officers arrived at defendant's home. There, McLaughlin decided not to execute the "no-knock" warrant and instead attempted to engage defendant in conversation. Defendant's mother answered the door and told defendant that Investigator McLaughlin had returned, to which defendant answered, "What the f—— does he want?" McLaughlin told defendant that he had a few more questions to ask her. From the top of the second floor stairs, defendant asked if the officers had a warrant. McLaughlin responded that he had a search warrant for her bedroom and not an arrest warrant.

Detective Norcross testified that at this point he heard defendant running upstairs and saw McLaughlin run up the staircase,

one hand gripping his weapon. As McLaughlin reached the top of the stairs, defendant fired an AK–47 assault rifle at McLaughlin. McLaughlin fell down the stairs, fatally wounded. Detective Norcross returned defendant's fire, but defendant shot Norcross in the hand, arm, and twice in the chest. As Norcross slid down the stairs, defendant leaned over the railing and shot Norcross in the leg. When defendant began to follow the wounded officer down the stairs, her mother intervened and pleaded with defendant to stop shooting. During that exchange, Detective Norcross was able to escape through a side door.

From a second floor window, defendant resumed firing on police positioned around the home. During that firefight, defendant shot and killed Officer John Norcross, Detective Norcross' brother and one of three officers who had arrived at the scene after the initial gunfire. After Officer Norcross was shot, a police dispatcher telephoned defendant and asked her to stop shooting. Defendant told the dispatcher to "[t]ell them to stop shooting at me. I don't know why they're shooting." Defendant also told him that she did not want her room searched or to be taken to jail.

The shooting finally ended around 2:30 p.m. After extended negotiations with police, defendant surrendered at 4:00 the next morning.

## B

Nelson was indicted and charged with two counts of purposeful or knowing murder by her own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) and/or (2); eight counts of first-degree attempted murder, contrary to *N.J.S.A.* 2C:5–1; third-degree unlawful possession of an assault firearm, contrary to *N.J.S.A.* 2C:39–5f; and second-degree possession of a firearm for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a. Defendant pled guilty to the two capital murder counts and to the second-degree aggravated assault of Detective Richard Norcross.

After defendant's first penalty trial, she was sentenced to life imprisonment for the murder of Investigator McLaughlin, with

thirty years of parole ineligibility, and to death for the murder of Officer John Norcross. However, this Court vacated Nelson's death sentence due to a *Brady* violation. *Nelson, supra,* 155 *N.J.* at 501, 715 *A.*2d 281; See *Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1197, 10 *L.Ed.*2d 215, 218 (1963) (holding that prosecution may not withhold any favorable, material evidence from a criminal defendant). Specifically, the State's failure to alert defendant to Detective Richard Norcross' civil complaint against county and municipal authorities required a retrial of defendant's sentence. A main theme of Nelson's defense was her "claim that the police were inadequately trained to handle situations involving mentally-ill and emotionally-disturbed people who are armed and dangerous." *Nelson, supra,* 155 *N.J.* at 517, 715 *A.*2d 281 (Handler, J., concurring and dissenting). Because Detective Norcross, the "State's key witness," *Nelson, supra,* 155 *N.J.* at 500, 715 *A.*2d 281, alleged that the authorities "acted in a 'palpably unreasonable' manner in 'failing to provide proper training and instruction to ensure the safety of the Haddon Heights Police Officers' who served the search warrant on defendant," *id.* at 496–97, 715 *A.*2d 281, we held that his complaint was material evidence in support of defendant's mitigation case.

Defendant's second penalty trial took place in Camden County in March 2001. The second penalty trial jury was charged with imposing a sentence for the murder of Officer John Norcross only. At that trial, the jury unanimously found two aggravating factors present: the murder was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement for the unlawful possession of a firearm (the 'escape detection' factor); and the murder occurred while the officers were engaged in the performance of their official duties (the 'public servant' factor). The jury rejected the "other murder" factor, that is, that defendant murdered Officer Norcross in the course of murdering Officer McLaughlin, by a vote of 11 to 1 in favor of that factor. With regard to mitigating factors, the jurors unanimously found three mitigating factors: 1) defendant had pled guilty and had accepted responsibility; 2) defendant had given up any right to

parole; and 3) defendant was making a positive contribution to prison life. Additionally, eleven jurors found that Nelson had a long history of mental illness or psychological problems that contributed to her conduct; eight jurors found that defendant's psychological or psychiatric make-up made her susceptible to an emotional breakdown and loss of judgment and reason; four jurors determined that inadequate training provided by law enforcement officers contributed to defendant's crimes; and four jurors found that Nelson's actions were triggered, in part, by the conduct of law enforcement. The jury unanimously found that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, and the trial court accordingly sentenced defendant to death. This appeal followed.

## C

Because defendant's psychological history is relevant to an evaluation of defendant's constitutionality argument, we set forth the history of defendant's mental illness in detail.

### 1. Defendant's Social History
#### Sheila Fairchild

Sheila Fairchild is a licensed social worker and the principal investigator for the DYFS unit of the Public Defender's Office, and testified on behalf of the defense. She interviewed defendant on eight separate occasions for a total of twenty-eight hours. Fairchild compiled a social history based on her interviews with defendant and thirty-five other individuals involved in defendant's life, including family members. Fairchild's report included the following findings.

In 1957, defendant was born a biological male, named Glenn Nelson, and was the second of four children.[1] Defendant's mother

---

[1] Generally, defendant will be referred to as Nelson or defendant. When using pronouns we will refer to Nelson as "his" or "him" in the period before his sexual reassignment operation, and to "her" in the period after the operation.

said that defendant continuously cried every day for approximately ten weeks when he started kindergarten. Defendant's kindergarten teacher reported that he was an emotionally disturbed child. During defendant's teen years, Nelson became increasingly reclusive, eliminating all interpersonal relationships in his life except that with his mother. One childhood friend said that he "went into a shell as high school approached," and defendant's brother called him "hermit."

He had a problem with bed-wetting, for which his father nicknamed him "Uriney". To stop the bed-wetting, defendant stated that he would tie a string around his penis and put plastic wrap over it. Mocking his fear of public restrooms, his father also called him "Mabel." Defendant was extremely self-conscious about his appearance and was unhappy about having male genitalia.

Family members stated that defendant became more of a loner, "isolated from the rest of [the family]." In high school, Nelson recalled being constantly picked on. Defendant's high school principal recalled that Nelson usually ate alone in the lunchroom.

Defendant recalled enjoying photos of nude women, fantasizing that he was one of the women in the pictures. His identification with women intensified as his psychological condition deteriorated. Defendant began shaving his legs and rummaging through Goodwill bins to find ladies' underwear, which he would put on when he got home. By the time he was twenty-six, he could no longer picture himself as a male. One year later in 1984, Nelson began thinking about sex reassignment surgery after reading about a doctor who performed that surgery. Defendant traveled to Colorado twice in 1986 to talk to a sex reassignment doctor, Dr. Stanley Biber. The doctor advised defendant to start taking female hormones.

In that same year, those around Nelson had noticed his changed behavior. He began wearing army fatigues to his job at an auto-parts warehouse. His employer stated, "I knew he was dis-

turbed." That year defendant also was robbed at knife-point in Philadelphia, which prompted him to purchase a handgun.

In 1987, defendant was arrested for possession of a weapon and dum-dum bullets and resisting arrest. The presentence report indicated that defendant stated that he "fell in love" with his gun. Defendant received probation and was ordered to undergo psychological evaluation.

Defendant's co-workers noted his fixation on suicide. Defendant's former manager recalled him as an eccentric person obsessed with suicide, and a supervisor at a later job stated that Nelson spoke constantly about suicide. In 1988, defendant's mother found a suicide note that stated that "he was sick of his life and he decided to find out if death had anything better to offer." Subsequently, defendant was committed involuntarily to a Camden County psychiatric facility for nineteen days.

The following year Nelson began preparation for the sex change surgery, but the persons with whom he consulted voiced concerns about his mental health. The electrolysis technician felt that defendant was "unstable" and referred him to a specialist in gender counseling. Defendant applied for sexual reassignment surgery in 1989 and begAN attending transsexual support groups. He began to see a certified sex therapist, Dr. Barbara Anderson, to fulfill the counseling requirement for surgery. He also began estrogen treatment. In 1990, defendant told Dr. Anderson that he felt like a "big empty eggshell," and that he wanted to look like a woman, but not be a woman. Shortly thereafter, defendant underwent breast augmentation surgery. Despite being alienated by family members, defendant appeared happier. However, Dr. Anderson concluded that defendant's severe psychological problems remained. Even though he did not feel like a woman trapped in a man's body, which according to Dr. Anderson is how sex-change candidates should feel, defendant completed the sex change in March 1992.

Nelson encountered severe harassment on returning to her warehouse job after her sex change operation. Specifically, the

warehouse's officer manager stated that the other employees "avoided Leslie whenever possible, ridiculed her behind her back[,] and the really bold and curious ones would ask her questions about the operations and one even asked Leslie if he could feel her breast implants." Defendant left that job in May 1992 and pursued her desire to become an exotic dancer. She was hired by an organization that contracted with go-go bars. However, when she was sent to dance, customers would reject her because of her clumsiness and their realization that she had been a male. Her failures as an exotic dancer continued through the next few years, as she received "countless rejections." Defendant's booking agent said she reacted to her dancing failures with depression, which worsened as Nelson continued to fail as an exotic dancer.

In 1993, defendant began to prostitute herself. She wrote another suicide note to her mother, stating she was tired of living and that it would have been better if she had never been born. She said she even felt like a failure at suicide because she could not work up the courage to kill herself. In 1995, she wrote a suicide note to a married man who had been a customer, confessing to him that she was a transsexual. She wrote that she had felt suicidal for a long time, that she was filled with self-hatred, and that she did not see any hope for the future.

### 2. Defendant's Medical Records

Defendant's mental health records disclose additional facts concerning her condition.

Defendant was counseled at a community health center after her 1987 arrest for weapon possession. Defendant stated that after her mugging she had become "increasingly paranoid about getting mugged again," and that she had been suicidal for the past year. The interviewing clinician's diagnosis was atypical depression, possibly schizoid personality disorder and post-traumatic stress disorder. Documents also indicate that defendant had "profound problems with low self-esteem," "severe problems with

social withdrawal, obsessive thoughts, paranoid, suspicious hostili-
ty," and "problems of modest proportions [with] dependency,
delusions, anxiety, tension, inappropriate affect, relationship with
siblings, interaction with peer groups, deals with conflict and
stress, [and] judgment." Treatment notes also indicate that de-
fendant said she had experienced suicidal ideation ever since she
was a child. However, some notes indicate that defendant had "no
idea of suicide or homicide" and "no future plans for himself."

When defendant was involuntarily committed to the Camden
County psychiatric facility in 1988, the primary diagnosis was
adjustment disorder with depressed mood and mixed personality
disorder with schizoid, borderline, and antisocial traits. However,
the prognosis was guarded because defendant had exhibited "little
insight and no interest in follow-up." In the "social discharge
summary," a psychiatric social worker wrote that "it [was] quite
conceivable that [defendant] could become depressed seriously
enough to injure himself or others," and recommended further
psychotherapy.

Another psychological evaluation by Dr. Philip Slonim indicated
that Nelson manifested "[m]arked schizoid tendencies." In that
evaluation, he stated the only thing defendant said she would
bring with her on a desert island was a gun for target practice.

Dr. Barbara Anderson interviewed defendant in preparation for
his surgery. She said that defendant would be a high risk of
suicide if denied surgery. Nevertheless, Dr. Anderson believed
that defendant might still present a high risk after surgery if his
expectations were not met. Anderson wrote that defendant was
"without the capacity for or appreciation of empathy," and was
"solely focused" on becoming a woman, even though he did not
feel as if he were a woman trapped in a man's body, feelings
generally associated with people who become transsexuals.

Pre-surgery notes from another psychiatrist, Dr. Mobilio, indi-
cated "no evidence of psychosis, no delusions, no hallucinations, no
thought disorder, no suicidal or homicidal ideations, and minimal
anxiety and depression." Social judgment also was evaluated as

"good." There were "no gross deficits in memory, intellectual functioning, attention, or concentration."

When defendant applied to the transgender program at Pennsylvania Hospital, the Minnesota Multiphasic Personality Inventory Test indicated that he "appeared to be suffering from a depressive disorder and may receive a diagnosis of dysthemic disorder and major affective disorder." Defendant was rejected by the program. He was again diagnosed with dysthemia and adjustment disorder with depressed mood by Dr. Lisa Giunto, the staff psychiatrist at a community mental health center.

### Dr. Kenneth Weiss

Dr. Weiss, the defense psychiatrist who testified at Nelson's penalty trial, met with defendant five times between 1995 and 1997, and reviewed her records. According to Dr. Weiss, defendant suffered from the following mental illnesses and disorders: (1) dysthemia, a long-standing depression, which was a major depression at the time of the murders; (2) a sexual identity disturbance, hating the gender into which she was born; and (3) adjustment disorder, which is an "acute disturbance ... that happens in a short period of time due to something happening to an individual." In Nelson's case, Dr. Weiss concluded that Nelson suffered particularly from adjustment disorder during the events prior to the murders.

Dr. Weiss testified that the sixth and seventh factors offered in mitigation were true. As noted, those factors were that defendant has a long history of mental illness and psychological problems that contributed to her conduct on the day of the murders, and that defendant's psychological and psychiatric makeup made her susceptible to an emotional breakdown and loss of judgment and reason on the day of the murders. The threat of taking away her guns and of going to jail, where she could not keep up her appearance as a woman, caused an emotional breakdown that affected Nelson's ability to reason. Weiss believed that she was at the point of suicide on the day of the murders. He stated that the loss of control attributable to Nelson's mental illness that occurred

during the McLaughlin murder continued through to the Norcross murder.

Weiss' opinion was that defendant should not have been allowed to have the sex reassignment surgery because she was not a "classic transsexual"; she did not feel like a woman trapped in a man's body. She hated her body and wanted, for some reason, to excite men. He testified that if a person is mentally ill, it calls into question whether that person is choosing surgery for the right reasons. Weiss also testified that defendant treated her guns as if they were her children. The psychiatrist testified that it is typical of those diagnosed with schizoid personality disorder to develop such attachments to inanimate objects.[2] Such people are not well-equipped to deal with stress because they lack a mature self-understanding or mature adaptations.

Dr. Weiss estimated that defendant's global functioning at the time of the murders was at "about forty out of a hundred," which he described as "basically a failing grade . . . in living."

### Dr. Robert Sadoff

Dr. Sadoff, who testified for the State, met with Nelson in 1997 for approximately two hours and reviewed her psychiatric and medical records. Sadoff agreed "in part" with Nelson's contention in mitigation that she had a long history of psychiatric problems that contributed to her violent conduct.

The significant distinction between Sadoff's and Weiss' testimonies was that Sadoff believed that the murders of Investigator McLaughlin and Officer Norcross were separated by a twelve-minute "cooling off" period. Sadoff's testimony was important to the State's case because that testimony attempted to justify to the jury the harsher sentence of death for the Norcross murder, in view of the fact that Nelson had been sentenced to life for

---

[2] The *Diagnostic and Statistical Manual of Mental Disorders* states that those with borderline personality disorder "may feel more secure" with inanimate possessions. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 652 (4th ed.1994) (hereinafter *DSM–IV* ).

murdering Investigator McLaughlin. Although the State was trying to prove that the murder of Norcross was committed in the course of McLaughlin's murder for purposes of establishing the "other murder" aggravating factor, the State relied on Sadoff's opinion to argue that Nelson deserved the more severe sentence for murdering Officer Norcross.

Aside from his "cooling off" theory, Dr. Sadoff's opinions did not significantly diverge from Dr. Weiss'. Sadoff acknowledged that Nelson had various mental disorders. He diagnosed Nelson with a mixed personality disorder that included traits from narcissistic, schizoid, avoidant, and borderline personality disorders. He concurred with Weiss' estimation of Nelson's bizarre attachment to her guns, stating that psychiatrists "could conclude ... that [Nelson] may have considered [her guns] like her children."

Sadoff disagreed with Weiss' opinion that Nelson was obsessed with suicide. Rather, Sadoff believed that "she had thought about suicide, she had talked about it," but she could not be obsessed because she had "ample opportunity" to end her life. With regard to the effect of Nelson's sex change on her well-being, Sadoff would not label the surgery a disaster; however, he did believe that the operation did not meet Nelson's expectations.

Dr. Sadoff denied that Nelson had a total breakdown in her ability to make judgments. For example, Sadoff cited Nelson's decision to stop firing at Detective Robert Norcross after her mother stepped in between her and the detective. Sadoff's opinion that Nelson did not have a total breakdown in reason and judgment is consistent with the absence of an insanity plea. Significantly, however, Sadoff agreed that "she had an impairment of her judgment at the time because of her condition, which made her more vulnerable to a partial breakdown or an impairment of her judgment more than the average person." Sadoff testified that "Nelson's ability to think clearly was impaired [in part] both by her anxiety and her depression." He also agreed that Nelson's fear of going to jail "was above and beyond the normal fear that anyone would have of going to jail ... because of her condition."

## II

We first consider defendant's claims that error inhered in the instructions to the jury and in the special verdict sheet.

Defendant maintains that the trial court erred by failing to instruct the jury adequately and clearly that in order for the jury to consider a specific aggravating factor in the weighing of aggravating and mitigating factors to determine defendant's sentence, that aggravating factor had to be unanimously found by the jury to be proven beyond a reasonable doubt. To support her claim, defendant points to the jury's responses on the completed verdict sheet which, she asserts, demonstrate that the jury failed to understand the unanimity requirement for the consideration of an aggravating factor during the weighing process. Accordingly, defendant claims that the trial court committed reversible error and her death sentence should be vacated. The State counters that the trial court correctly instructed the jurors multiple times on the unanimity requirement for aggravating factors, and that the verdict sheet does not show that the jury misunderstood the instructions. Moreover, the State claims, any possible error in the instructions was harmless.

At the sentencing trial, the State proffered three aggravating factors: (A) murder committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another, *N.J.S.A.* 2C:11–3c(4)(f); (B) murder while engaged in the commission of another murder, *N.J.S.A.* 2C:11–3c(4)(g); and (C) murder of a public servant, *N.J.S.A.* 2C:11–3c(4)(h). The jury unanimously found that aggravating factors A and C had been proven beyond a reasonable doubt. However, only eleven jurors found aggravating factor B—murder while engaged in the commission of another murder—to have been proven beyond a reasonable doubt. Because New Jersey law requires a capital sentencing jury to disregard an aggravating factor if that factor is not found unanimously by the jury, *State v. Koskovich,* 168 *N.J.* 448, 524, 776 *A.*2d 144 (2001), the jurors were authorized to weigh only aggravating

factors A and Ċ against the mitigating factors to determine the appropriate punishment. *Id.* at 519, 776 *A*.2d 144.

Defendant concedes that the first reference made by the court to the unanimity requirement for the consideration and weighing of an aggravating factor was correct. After introducing the concepts of aggravating and mitigating factors to the jury, and explaining that aggravating factors had to be proven beyond a reasonable doubt before being considered, the court instructed the jury as follows:

> In order for the jury to find any aggravating factor, all 12 deliberating jurors must agree that the State has proven the aggravating factor beyond a reasonable doubt. In other words, with respect to the finding of aggravating factor [sic], the jury must be unanimous that an aggravating factor has been proven before it may be considered. If one or more jurors decide that the State has not proven an aggravating factor or aggravating factors beyond a reasonable doubt, then no juror may consider the alleged aggravating factor or aggravating factors in the weighing process. Rather, you're to disregard any alleged aggravating factor which all 12 jurors do not find was proven beyond a reasonable doubt. And you are to further disregard any evidence relating to such an alleged aggravating factor.

Defendant acknowledges that this instruction properly conveyed that no juror could consider and weigh a specific aggravating factor unless all twelve jurors had unanimously found that factor to be proven beyond a reasonable doubt. However, defendant alleges that by the time the trial court finally provided that correct instruction to the jury, the court previously had mentioned the "beyond a reasonable doubt" standard of proof for an aggravating factor six times without reference to the unanimity requirement. The State responds that the court's emphasis on the "beyond a reasonable doubt" standard without mentioning unanimity early in the instructions is of no consequence because there is no conflict between that standard and the unanimity requirement.

Defendant claims that the correct instruction on the unanimity requirement set forth above was the only accurate instruction that the trial court gave on the issue. Defendant cites to the following instruction as one that purported to include the unanimity require-ment for the consideration of an aggravator but did not: "If you have unanimously found beyond a reasonable doubt that one or

more aggravating factors exist, then you will consider the mitigating evidence." Defendant asserts that the unanimity requirement mentioned in that portion of the instruction does not convey unambiguously that a *specific* aggravating factor must be found unanimously in order to be considered in the balancing process. The jury could unanimously agree that the State had proven "one or more" aggravating factors, and yet still not have been aware that the only aggravators that each juror could consider were the ones unanimously found.

Next, defendant contends that the trial court's omission of the unanimity requirement for the consideration of an aggravator in its "ultimate instruction" was particularly egregious because that instruction was given at "perhaps the single most crucial point" in the jury charges. This "ultimate instruction" provided:

> *If you do not unanimously find that the State had proven one or more aggravating factors,* your deliberations have concluded and the defendant will be sentenced to life in prison without the possibility of parole. *If you unanimously find that the State has proven beyond a reasonable doubt one or more aggravating factors,* then you must weigh the aggravating factor or factors against any mitigating factors which you've found.

[ (Emphasis added).]

Defendant claims that this "ultimate instruction" is deficient for the same reason as the instruction previously discussed, *Supra* at 448, 803 *A*.2d at 19.

The State alleges that the court did reiterate the unanimity requirement during both instructions deemed ambiguous by defendant. Further, it notes the following instruction, immediately preceding the "ultimate instruction," as evidence that the trial court correctly instructed the jurors multiple times on the unanimity requirement for aggravating factors:

> The evidence relating to mitigating factors should be fully discussed by the jury. To the extent possible, you should attempt to reach an agreement on the question of whether a particular mitigating factor does or does not exist. However, the law does not require unanimity with respect to the finding of mitigating factors. Therefore, each juror must individually determine whether or not each mitigating factor exists and *each juror must individually decide whether any aggravating factor or aggravating factors unanimously found* outweigh beyond a reasonable

doubt the mitigating factor or mitigating factors that the juror has found to be present.

[ (Emphasis added).]

In further support of her claim that the court's instructions were inadequate, defendant then points to the jury's response to the "special verdict" portion of the verdict sheet as proof of the actual prejudice caused by the jury instructions. The verdict sheet stated:

If you have unanimously found more than one aggravating factor present, then indicate as to each factor whether it, by *itself*, outweighs the mitigating factors beyond a reasonable doubt [Emphasis added.]

The jury responded by inserting the following:

| Aggravating Factor "a" | No (0) | Yes (12) |
|---|---|---|
| Aggravating Factor "b" | No (1) | Yes (11) |
| Aggravating Factor "c" | No (0) | Yes (12) |

According to defendant, because the jury indicated that eleven jurors found that aggravating factor B outweighed the mitigating factors by itself, it is likely that the jurors also considered factor B in determining whether the aggravating factors outweighed the mitigating factors. Thus, the trial court's inadequate jury instructions resulted in the jury's failure to understand that it was not to weigh an aggravating factor unless that factor had been unanimously found.

The State counters that the verdict sheet reinforces its position that the trial court made repeated reference to the unanimity requirement. For example, the State notes that the first question on the verdict sheet, labeled *"AGGRAVATING FACTORS,"* asked the jury: "Do you unanimously find beyond a reasonable doubt that *any* of the following aggravating factors exist[.]" As further proof, the State highlights the following directive on the verdict sheet: "If you have unanimously found that one.or more aggravating factors were present, go to number "2" below," number "2" being the portion of the verdict sheet that asks if the jury has found any mitigating factors". Finally, the State argues that the special verdict directive itself is substantiation for its claim. It states: "If you have unanimously found more than one aggrava-

ting factor present, then indicate as to each factor whether it, by itself, outweighs the mitigating factors beyond a reasonable doubt." However, the State concedes that the wording of the special verdict section was "inartful."

The State further asserts that the fact that the jurors responded to the question whether they found aggravating factor B to outweigh the mitigators by itself does not demonstrate that the jury misunderstood the unanimity requirement. The jurors were simply saying that, if asked, eleven would have also found factor B to outweigh the mitigators. In any event, the State maintains, even if eleven of the jurors did consider aggravating factor B, that it was not plain error—all twelve jurors had found aggravating factors A and C to outweigh the mitigators by themselves, respectively.

For the reasons set forth below, we find that the trial court's jury instructions were not erroneous *per se*. However, we conclude that the trial court's ambiguous wording of the verdict sheet, in conjunction with the jury's obviously confused response to the special verdict directive, and the trial court's refusal to ask the jury for clarification, demonstrates error. Further, we agree with defendant that this error should be analyzed pursuant to the harmful error standard. Applying that standard, we find that the trial court's error was not harmless.

## A

■ This Court has stressed repeatedly that " 'clear and correct jury instructions are essential for a fair trial.' " *Koskovich, supra*, 168 *N.J.* at 507, 776 *A.*2d 144 (quoting *State v. Brown*, 138 *N.J.* 481, 522, 651 *A.*2d 19 (1994)). " 'A [jury] charge is a road map to guide the jury, and without an appropriate charge, a jury can take a wrong turn in its deliberations.' " *Id.* at 508, 776 *A.*2d 144 (quoting *State v. Martin*, 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990)). In fact, "so critical is the need for accuracy that erroneous instructions on material points are presumed to be reversible error." *Martin, supra*, 119 *N.J.* at 15, 573 *A.*2d 1359. Although the

importance of jury instructions in criminal cases is well-established, this Court has "emphasized that jury instructions 'are even more crucial in a capital case because of the jury's responsibility to decide whether a defendant shall live or die.'" *Koskovich, supra,* 168 *N.J.* at 524, 776 *A.*2d 144 (quoting *State v. Bey,* 112 *N.J.* 123, 162, 548 *A.*2d 887 (1988)). It also is well-settled that a reviewing court must evaluate a challenged jury instruction in the context of the entire charge to determine whether the challenged language was misleading or ambiguous, *State v. Simon,* 161 *N.J.* 416, 477, 737 *A.*2d 1 (1999); *State v. Clausell,* 121 *N.J.* 298, 330, 580 *A.*2d 221 (1990), and "[t]here can be no assumption that the jury did not faithfully follow the [court's] admonition." *State v. Manley,* 54 *N.J.* 259, 271, 255 *A.*2d 193 (1969).

█ As noted, we do not find the trial court's jury instructions to be erroneous *per se.* Central to our conclusion is the fact that the trial court first gave a complete and unambiguous instruction on the issue of jury unanimity for the consideration and weighing of an aggravating factor. That instruction unambiguously stated that the jury must find unanimously that an aggravating factor has been proven beyond a reasonable doubt before that factor may be considered and weighed against any mitigating factors. Moreover, the instruction conveyed that if one or more jurors decided that the State had not proven an aggravating factor beyond a reasonable doubt, then no juror could consider that aggravating factor. *Supra* at 443, 803 *A.*2d at 16.

█ As for defendant's contention that this specific instruction was diminished by the trial court's referencing the standard of proof for an aggravating factor six times before mentioning the unanimity requirement, that claim is unpersuasive. There is no conflict between the "beyond a reasonable doubt" standard of proof for an aggravating factor and the unanimity requirement for an aggravating factor.

Also supporting our holding that the jury charge by itself was not erroneous was the trial court's statement to the jury that "each juror must individually decide whether any aggravating

factor or aggravating factors unanimously found outweigh beyond a reasonable doubt the mitigating factor or mitigating factors that the juror has found to be present." *Supra* at 444–45, 803 *A.*2d at 17. That instruction, although not sufficient on its own to properly inform the jury of the unanimity requirement, serves as reinforcement of the complete instruction discussed above.

■ We now consider those instructions that defendant asserts are ambiguous. The first instruction stated that "[i]f you have unanimously found beyond a reasonable doubt that one or more aggravating factors exist, then you will consider the mitigating evidence." The second is the "ultimate instruction" that states, in pertinent part, "[i]f you unanimously find that the State has proven beyond a reasonable doubt one or more aggravating factors, then you must weigh the aggravating factor or factors against any mitigating factor or factors which you've found." The unanimity requirement noted in those instructions does not unambiguously convey that a *specific* aggravating factor needs to be found unanimously in order to be considered in the balancing process. The jury can unanimously *agree* that the State has proven "one or more" aggravating factors, and yet still not be aware that the only aggravators that each juror may consider are the ones unanimously found. Some jurors found two aggravators; some found three. Therefore, they unanimously found that the State proved "one or more" aggravating factors, and those two instructions did not specifically inform the jurors who found three aggravators that they could not consider the non-unanimous aggravator or the evidence supporting it.

However, the instructions also may be interpreted as suggesting exactly what the trial court intended and what the State alleges that they impart—that a specific aggravating factor must be found unanimously in order to be considered in the weighing process.

Each party presents a defensible interpretation of the instructions. One may interpret them as correctly conveying the law; one may interpret them as misstating the law. In view of the clear and comprehensive instruction on the unanimity issue deliv-

ered first, and the fact that nothing was said overtly to contradict the instruction, and applying the tenet that we must evaluate jury instructions as a whole, *Simon, supra,* 161 *N.J.* at 477, 737 *A.*2d 1, we do not find that the court's ambiguous instructions render the jury instructions erroneous as a whole.

## B

We turn now to the special verdict sheet. In order to provide context for our analysis, we reproduce the verdict sheet at the conclusion of this opinion.

■ We have stressed above the need for correct and unambiguous jury instructions in capital cases, "especially with respect to the jury's balancing of aggravating and mitigating factors." *Koskovich, supra,* 168 *N.J.* at 525, 776 *A.*2d 144. The need for clear verdict sheet directions is no less important. After verbal instructions are given and the jurors retire to the jury room, they are left alone with the directions on the verdict form. Their efforts to answer questions that they may have about verbal instructions almost certainly would involve an examination of the verdict sheet directions. Jurors are likely to refer, and refer often, to the directions on the verdict form. If verbal instructions are unclear, or if jurors do not fully comprehend verbal instructions, the typewritten verdict sheet is likely the primary road map they will use to direct their deliberative path.

■ Preliminarily, the State asserts that the verdict sheet reinforces its position that the trial court made repeated reference to the unanimity requirement. Specifically, the State emphasizes the following excerpts from the verdict sheet:

On page 1 of the verdict sheet:

Do you unanimously find beyond a reasonable doubt that *any*[3] of the following aggravating factors exist[;]

---

[3] Significantly, the word *any* is triply emphasized in the verdict sheet: it is italicized, underlined, and in bold print.

On page 2 of the verdict sheet:

If you have unanimously found that one or more aggravating factors were present, go to number "2" below [; and]

On page 4 of the verdict sheet:

If you have unanimously found more than one aggravating factor present, then indicate as to each factor whether it, by itself, outweighs the mitigating factors beyond a reasonable doubt.

We disagree that these excerpts support the State's position. Rather, we find that they suffer from the same ambiguity as the jury instructions discussed above. Like the jury instructions, the verdict sheet merely directs that if each juror found "any," "one or more" or "more than one" of the aggravating factors exists, then the jury is to move on. It does not specify that the jury needs to be unanimous regarding a *specific* aggravator in order to consider it.

It is true that, like the ambiguous oral jury instructions, the verdict sheet also could have been understood to reflect what the trial court intended and what the State contends that it conveys—that a specific aggravating factor must be found unanimously in order to be considered in the weighing process.

█ The ambiguously drafted verdict sheet differs from the ambiguous oral jury instructions in that the verdict sheet does not contain a written analogue to the one comprehensive oral instruction contained in the oral instructions. Stated differently, there is no language in the verdict sheet that could serve to clarify the ambiguous language contained therein. All the jury had to refer to was the ambiguous language itself—on the verdict sheet in black and white.

The State's response is that the jury could hearken back to the one clear oral instruction it was given to allay any potential confusion created by the ambiguous verdict sheet. There are two difficulties with that argument. First, a jury is more likely to refer to the writing directly before it to resolve any potential confusion rather than attempt to recollect an oral instruction. Second, even though a jury is presumed to consider whatever it remembers from the court's charge, the State's position in this

appeal places inordinate faith in the jurors' abilities to recall details in a verbal instruction to reconcile an ambiguity found in a verdict sheet. As one commentator stated:

[S]tudies show[ ] that jurors frequently cannot answer simple true-false questions concerning statements of law taken from instructions they were given in court. Their understanding is often little better than that of persons who never heard the instructions at all. This suggests that the problem is not just one of comprehension, for jurors in these studies were not asked to explain or apply the legal rules. Rather, *it was simply a matter of whether they could recall or recognize instructions they had heard.*

[Christopher N. May, *"What Do We Do Now?": Helping Juries Apply the Instructions,* 28 Loy. L.A. L.Rev. 869, 879–80 (1995)(emphasis added).]

Although we do not find the instructions on the verdict sheet to be erroneous *per se,* we hold that the verdict sheet's ambiguous wording, coupled with the jury's clearly confused response to the special verdict instruction and the failure of the trial court to obtain clarification for the jury, demonstrates trial court error, which we cannot consider harmless.

The special verdict instruction, followed by the jury's response, was as follows:

If you have unanimously found more than one aggravating factor present, then indicate as to each factor whether it, by itself, outweighs the mitigating factors beyond a reasonable doubt:

| | | |
|---|---|---|
| Aggravating Factor "a" | No (0) | Yes (12) |
| Aggravating Factor "b" | No (1) | Yes (11) |
| Aggravating Factor "c" | No (0) | Yes (12) |

The instruction's apparent intent was to have the jury "indicate," or identify, on the special verdict sheet only those specific aggravating factors that the jury unanimously had found. By inserting a response for aggravating factor B, which the jury had not found unanimously, the jury demonstrated that it might not have understood that it was prohibited from considering those aggravating factors that it did not find unanimously. Moreover, the jury may have been indicating that eleven jurors found that aggravating factor B, *by itself,* outweighed the mitigating factors beyond a reasonable doubt. Accordingly, there is the possibility that at least some of those eleven jurors considered aggravating

factor B in the balancing process that determined the imposition of the death penalty in this appeal. If eleven jurors found aggravating factor B sufficient enough to outweigh all the mitigating factors by itself, one or more of those jurors may well have taken factor B into account when making the ultimate decision whether defendant would receive life imprisonment or the death penalty.

■ Specifically, the jury's responses to the special verdict section of the verdict sheet are troublesome on two levels. First, under a reasonable interpretation of the special verdict section, its question supports the jury's consideration of any aggravating factor, regardless of whether that factor had been unanimously found. It suggests that the jury may evaluate the relative weights of each aggravating factor, considered alone, against the mitigating factors, so long as the jury unanimously found more than one aggravating factor present. The danger the question posed is that it might lead jurors to believe that jurors could consider an aggravating factor that an individual juror found, even if that specific factor was not found by all twelve jurors, so long as the jury found more than one aggravating factor present.

Second, and more important, that danger might have come to fruition. The jury answered the special verdict question, indicating that it might well have considered the relative weights of aggravating factor B and the mitigating factors. The jurors' possible consideration of aggravating factor B substantiates our concern that the verdict sheet supported the jurors' consideration of a rejected aggravating factor when weighing the aggravating factors against the mitigating factors. The verdict sheet and the jury's responses to it undermine our confidence in the jury's verdict because there is no guarantee that the jurors understood they were not to consider factor B in weighing the aggravating and mitigating factors. We cannot be certain that the jurors did or did not give weight to aggravating factor B.

Importantly, defense counsel objected to the inclusion of the special verdict question even before the trial judge submitted it to

the jury. Specifically, defense counsel objected "to the last portion where the jury is asked to advise the Court whether in the event it finds a death verdict any one of the three aggravating factors or two of the three in and of themselves were found by the jury to outweigh the mitigating factors beyond a reasonable doubt." Perhaps defense counsel was concerned that subsection B of the "Decision of the Jury" portion of the verdict sheet could encourage some jurors to rely on an aggravating factor not found unanimously. What we do know is that counsel had a constitutional concern because the special verdict question essentially asked the jury to provide an advisory opinion, which could not serve as the basis for a death sentence. Whatever may have been the precise reason for the objection, defense counsel emphasized that "we rather strongly oppose that portion of the verdict form," referring to the special verdict question, which asked the jurors to indicate whether any aggravating factor "by itself" outweighed the mitigating factors.

After the jurors completed the verdict form, defense counsel also brought to the attention of the trial court his concerns about the jurors' responses to the special verdict question. Specifically, counsel stated:

> The jurors have indicated that with respect to aggravating factor B, eleven jurors found that it in and of itself outweighed the mitigating factors beyond a reasonable doubt but the jury didn't find unanimously beyond a reasonable doubt that mitigating [sic] factor B had been proven in the case. *And the obvious concern that we have is the extent to which that suggests that eleven jurors who voted for B considered it in the weighing process even though they were not supposed to* because it makes no sense that they would indicate that 11 to 1 considered that B outweighed the mitigating factors beyond a reasonable doubt and at least from that point of view *I'm extremely troubled by the suggestion that these 11 jurors who voted for B used it improperly in the weighing process to decide that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt in contravention to the Court's instruction.*
>
> [Emphasis added.]

The State acknowledged, at least implicitly, some merit to defendant's concerns. The assistant prosecutor stated at the trial that "it appears that the question may not have been as artfully framed as it might have been." The State also indicated that it

would not object if the trial court sent the issue back to the jury for clarification of the verdict sheet. The trial court said that it thought it understood the jury's intent and thus, despite the State's invitation to the trial court, the court refused to clarify the matter.

As we stated in *Koskovich, supra*, 168 *N.J.* at 523, 776 *A.*2d 144, "[w]e have emphasized repeatedly the importance of the balancing process engaged in by jury members during the penalty phase." Based on conflicting beliefs about whether a defendant should live or die, that balancing process results in a judgmental determination by the jury. *Ibid.* "The importance of the jury's determination cannot be overstated as '[t]he entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die.'" *Id.* at 524, 776 *A.*2d 144 (quoting *State v. Ramseur*, 106 *N.J.* 123, 311, 524 *A.*2d 188 (1987), *cert. denied*, 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993)). Accordingly, "we are especially sensitive to ensuring the correctness of jury instructions concerning the jury's balancing of aggravating and mitigating factors, because that balancing represents the core of the jury's function in the penalty phase." *Ibid.* "Because of the singular and unique importance of that decision, there must be little chance that the jury as a whole, or even an individual juror, is confused about the process." *Id.* at 525–26, 776 *A.*2d 144.

We find that *Koskovich's* admonition to ensure the correctness of jury instructions concerning the balancing of aggravating and mitigating factors applies to jury verdict sheets as well. Although the jury verdict sheet in this appeal might not have been obviously incorrect, it was ambiguous concerning the crucial unanimity requirement. Moreover, the verdict sheet did not fail simply to clarify the law; it exacerbated the ambiguity by suggesting the consideration of aggravating factors not unanimously found. *Cf. Clausell*, 121 *N.J.* at 345–46, 580 *A.*2d 221 (noting that verdict form compounded confusion created by verbal instructions,

even though trial court correctly instructed jury on matter at issue once). Coupled with the jury's response—its confusion in respect of whether it was permitted to consider those aggravating factors it did not find unanimously, as well as the strong possibility that some of the eleven jurors erroneously considered aggravating factor B in the jury's imposition of the death penalty on defendant—we find that there was trial court error here. The enhanced reliability required for death sentence mandates that there "be little chance that the jury as a whole, or even an individual juror, is confused about the process." *Koskovich, supra,* 168 *N.J.* at 526, 776 *A.*2d 144. When assessing a confusing charge, " '[w]here the life of an accused is at stake, it is too risky to determine what the instructions . . . could mean to the twelve lay minds of the jurors.' " *Id.* at 524, 776 *A.*2d 144 (quoting *State v. Wynn,* 21 *N.J.* 264, 271, 121 *A.*2d 534 (1956)).

Here, the verdict sheet suggests the possibility, indeed probability, that the jurors were confused about whether eleven of them could consider aggravating factor B in the weighing process. Even the prosecutor recognized the possibility that jurors were confused. Accordingly, the trial court should have asked the jury to clarify its response to the special verdict sheet. Because the court failed to do so, we must find that there was trial court error here. The "singular and unique importance of [the jury's] decision," *ibid.,* demands nothing less.

 For the benefit of parties and trial courts in the event that similar circumstances arise in the future that call for clarification, a trial court should emphasize that in order for each juror to weigh a specific aggravating factor when balancing it against the mitigating factors, all twelve jurors must have found that that factor was proven beyond a reasonable doubt. If even one juror does not find that factor beyond a reasonable doubt, no juror can consider it in the weighing and balancing process.

## C

 The State asserts that because defendant's trial counsel did not object during the jury instructions any error found by this

Court must be analyzed pursuant to the "plain error" standard. Defendant replies that her attorney did object to the special verdict sheet before it was submitted to the jury, and also objected upon reading the completed verdict sheet, and thus the "harmful error" standard should be utilized. We agree with defendant.

 The State maintains that even if this Court were to find that the trial court erred in its effort to explain the unanimity requirement to the jury, such an error would be harmless. Because the jury indicated that it found aggravating factors A and C, respectively, to outweigh the mitigating factors by themselves, the fact that eleven jurors might have considered rejected aggravating factor B during the balancing of the aggravating and mitigating factors was irrelevant.

We previously have been faced with a similar scenario. In *State v. McDougald,* 120 *N.J.* 523, 577 *A.*2d 419 (1990), the jury unanimously found all three aggravating factors submitted by the State and unanimously found that the aggravating factors collectively outweighed the mitigating factors. *Id.* at 548, 577 *A.*2d 419. After finding that all three aggravating factors outweighed the mitigating factors, the jury also found two of the aggravating factors to outweigh, individually, the mitigating factors. *Ibid.* On review, we found erroneous the instructions on one of the aggravating factors, which invalidated the jury's conclusion that all three aggravating factors considered together outweighed the mitigating factors, and undermined its conclusion that the invalid aggravating factor outweighed the mitigating factors by itself. Even though the jury indicated in its verdict form that a remaining, properly considered aggravating factor outweighed the mitigating factors by itself, we vacated the defendant's death sentence. *Id.* at 564–66, 577 *A.*2d 419.

 We adhere to that decision. A death sentence may not rest on a jury determination that the jury did not understand to be essential to its verdict. While the jury here knew that the conclusion it would reach after weighing the combined aggravating

and mitigating factors would determine defendant's sentence, it was unaware that there could be any significance attached to its conclusions regarding the special verdict section. Assuming that the jurors first considered whether the combined aggravating factors outweighed the mitigating factors, their essential deliberations were completed once they concluded that the aggravators outweighed the mitigators. The verdict sheet provided no indication to the jurors that their answers to the special verdict section would affect in any way their verdict and the sentence that defendant would receive. Juror responses to questions they do not understand as essential to the sentence a defendant will receive cannot satisfy the requirement that a death verdict must carry an enhanced reliability. See *Bey, supra,* 112 *N.J.* at 162, 548 *A.*2d 887 ("Correlative to that responsibility [in deciding between life and death] is the requirement of enhanced 'reliability in the determination that death is the appropriate punishment in a specific case,' " quoting *Caldwell v. Mississippi,* 472 *U.S.* 320, 330, 105 *S.Ct.* 2633, 2640, 86 *L.Ed.*2d 231, 240 (1985)).

In the present case, for example, we do not know if the jury understood the potential significance of its answers to the special verdict section and exhausted its deliberations in considering whether Nelson's purpose to avoid apprehension (aggravating factor C) outweighed, by itself, the mitigating evidence Nelson produced, when considered apart from the "public servant" and "other murder" aggravating factors. To make sure that jurors comprehend their responsibility in capital sentencing trials, we have stated, "[i]n addition to providing appropriate instructions, a trial court ensures compliance with [the] weighing process by providing a verdict sheet that informs the jury of the consequences of its decisions and by polling jurors to assure their individual agreement with the verdict." *Bey, supra,* 112 *N.J.* at 163, 548 *A.*2d 887 (citing *Ramseur, supra,* 106 *N.J.* at 316 n. 80, 524 *A.*2d 188). Here, while the verdict sheet conveyed the consequences of finding that the aggravating factors proven to exist outweigh the mitigating factors, the special verdict sheet question did not indicate that the jury's answers to it would have any

consequences for defendant's sentence. As far as the jury could tell, the special verdict sheet question was not essential to its deliberations about what the appropriate punishment is for Nelson. Additionally, as noted previously, the court chose not to ask the jury for a clarification of its answers to the special verdict sheet question.

We have previously decided that a jury determination that is not essential to a jury's verdict should not be considered to have the reliability of a final verdict. *State v. Koedatich,* 118 *N.J.* 513, 525–27, 572 *A.*2d 622 (1990) (*Koedatich II*). In *Koedatich II,* we held that a jury's failure to find unanimously an aggravating factor at a first sentencing trial does not bar the resubmission of that aggravating factor at a subsequent sentencing retrial. *Id.* at 524, 572 *A.*2d 622. We reasoned that "a jury charged with deciding the existence of several aggravating factors might not necessarily exhaust its deliberative capacity in an effort to achieve unanimity on all such factors if it should determine that *one* aggravating factor, on which it does unanimously agree, outweighs the mitigating factors beyond a reasonable doubt." *Koedatich II,* 118 *N.J.* at 525–26, 572 *A.*2d 622. Because a jury's vote on a particular aggravating factor might be superfluous to its decision, we held that a non-unanimous vote on an aggravating factor does not carry the reliability of a final verdict. *Ibid.*

The issue at hand is similar to *Koedatich II* in that we are asked whether the jury's answers to the special verdict section, which were superfluous to its deliberations on defendant's appropriate sentence, have the reliability of a final verdict. The problem with endorsing extraneous votes as final verdicts is that jurors may lack the motivation to exhaust deliberations on issues that are inessential to the ultimate verdict because it is unclear what, if any, consequences would follow. A juror who finds the combined aggravating factors to outweigh the mitigating factors and, therefore, votes for death, will reasonably not see any motivation to continue deliberating to consider whether a single aggravating factor outweighs the mitigating factors, as long as the juror does

not understand the significance that the special verdict question may have.

Our need for assurance that the jury understood the potential consequences of its answers to the special verdict question is heightened by the specific facts of this case. Those same facts also made especially crucial the need for consistent and unambiguous instructions, including directions on the verdict sheet. To prove aggravating factor B, the State had to prove that the murder of Officer John Norcross was committed in the course of the murder of Investigator McLaughlin. In attempting to prove that factor during the penalty phase, the State argued that the murders of Officers McLaughlin and Norcross were part of one continuous action. Simultaneously, the State was attempting to show that there was significant distinction between the two murders that would justify different sentences for each crime. That State tactic was adopted because, at the time of defendant's penalty-phase trial under review, defendant already had been sentenced to life for the murder of Investigator McLaughlin at her first penalty trial. To that end, the State presented expert testimony to show that the Norcross murder followed a twelve-minute "cooling off" period for defendant, which demonstrated her "deathworthiness" for the Norcross murder. The State wanted the jury to accept both arguments, and the arguable tension between them constituted a theme of the trial. Thus, the fact that one juror rejected the first argument, in rejecting aggravating factor B, is highly significant because that rejection implied that the jury as a whole could not accept both State contentions. The jury could not accept that the murder of officer Norcross occurred in the course of the murder of Investigator McLaughlin. *Cf. Koskovich, supra,* 168 *N.J.* at 525, 776 *A.2d* 144 (stating that need for clear instruction was especially important because of particular theme of State's case).

Because our confidence that the jury correctly understood the governing law has been undermined by the verdict sheet and the jurors' responses, and because we cannot rest a death sentence on

the jury's answers to the special verdict section, we vacate Nelson's death sentence.

## III

### A

Defendant contends that the prosecutor's comments in respect of the expert witnesses who testified on behalf of the defense constituted prejudicial error.

■■■ Prosecutors are expected to make a vigorous and forceful closing argument to the jury, *State v. Rose*, 112 *N.J.* 454, 517, 548 *A.*2d 1058 (1988), and are afforded considerable leeway in that endeavor, *State v. Smith*, 167 *N.J.* 158, 177, 770 *A.*2d 255 (2001). Nevertheless, there is a fine "line that separates forceful from impermissible closing argument." *Rose, supra*, 112 *N.J.* at 518, 548 *A.*2d 1058. Thus, a "prosecutor must refrain from improper methods that result in wrongful conviction, and is obligated to use legitimate means to bring about a just conviction." *Smith, supra*, 167 *N.J.* at 177, 770 *A.*2d 255.

■■■ It is well-settled that the standard for reversal based upon prosecutorial misconduct requires an evaluation of the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial. *Papasavvas, supra*, 163 *N.J.* at 625, 751 *A.*2d 40. " 'To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense.' " *Ibid.* (quoting *Timmendequas, supra*, 161 *N.J.* at 575–76, 737 *A.*2d 55) (internal quotations and citations omitted). Moreover, "[b]ecause death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters; prosecutors who fail to take seriously their particularly stringent ethical obligations in capital cases thus strongly risk postponing, and even jeopardizing, the

enforcement of the law." *Ramseur, supra,* 106 *N.J.* at 324, 524 *A.*2d 188.

We recently reaffirmed the principle that prosecutors are prohibited from casting unjustified aspersions on the defense or defense counsel. *Smith, supra,* 167 *N.J.* at 177, 770 *A.*2d 255 (citing *Frost, supra,* 158 *N.J.* at 86, 727 *A.*2d 1). In that regard, we have " 'not hesitated to reverse convictions where we have found that the prosecutor in his [or her] summation over-stepped the bounds of propriety and created a real danger of prejudice to the accused.' " *Id.* at 178, 770 *A.*2d 255 (quoting *State v. Johnson,* 31 *N.J.* 489, 511, 158 *A.*2d 11 (1960)). For example, in *Rose, supra,* 112 *N.J.* at 518, 548 *A.*2d 1058, we held that the prosecutor's comments implying that the defense expert's testimony was fabricated or contrived with the assistance of defense counsel was "clearly improper." In so holding, we observed that the record was completely devoid of evidence supporting the prosecutor's implications and that both experts were "well qualified ... and [ ] carefully explained the basis for their opinions[.]" *Id.* at 519, 548 *A.*2d 1058.

In the present appeal, the prosecutor implied, at several points during his summation, that the expert testimony of Dr. Gelles and Dr. Weiss was contrived and that the testimony of the State's expert, Dr. Sadoff, was credible because he "did not consider himself a member of the prosecution team." Specifically, the prosecutor stated:

Mr. Gelles, I suggest to you as you heard that testimony, *went over the edge a little bit.* For the most part, he was a very competent witness, very credible witness, but in those moments when he talked about the impulsiveness, the lack of understanding or knowledge that there was a danger that lurked at the top of those stairs, *I suggest to you that he went over the edge as a member of the defense team to help this defendant, to help Leslie Nelson's case.* Was he the first defense witness to do that? No. By no means was he the first defense witness to do that. Dr. Weiss, did you consider yourself a member of the defense team in this case? Yes, I did. You heard that. *He is an expert, he is supposed to offer to this jury information, facts, opinions that will assist you in the very important job that you have to do. Can he do that if he comes before you as a partisan? Can he do that if he comes before you with an agenda? Can he do that if he's wearing the same color jersey as the other people on Leslie Nelson's team?*

. . .

Is [Dr. Weiss's] testimony that [sic] makes sense, that's reasonable, that's logical, that assists you? Or is it, again, an endeavor on his *part to go over the line a little bit, over the edge a little bit because at no time can Dr. Weiss forget what color jersey he's wearing on the stand, what team he's on.*

. . .

Dr. Weiss reaches conclusions, reaches opinions, reaches decisions in the case based in part on information imparted to him by Leslie Nelson, this defendant. Is she interested in telling him the truth about what she did and what was in her mind that day? Or is she interested in a successful defense? Is she motivated by something other than seeking out and explaining the truth?

. . .

*Now Dr. Sadoff, I suggest to you, did not consider himself a member of the prosecution team, did not consider himself a member of any team.* Dr. Sadoff I suggest to you came in here to give you his honest-to-goodness best judgment and opinions. And a lot of his answers, [defense counsel] was right, a lot his answers were helpful to the defense.

[Emphasis added.]

## B

The prosecutor's statements in the present case were clearly improper. His characterization of Dr. Gelles and Dr. Weiss as part of the "defense team" and wearing the "same color jersey as the other people on Leslie Nelson's team" and other comments above insinuated that the experts' testimony was contrived and that they had colluded with the defense. Further, the prosecutor's statements that Dr. Gelles "went over the edge as a member of the defense team to help this defendant, to help Leslie Nelson's case", and his characterization of Dr. Weiss as a "partisan" with "an agenda" clearly "crossed the line that separates forceful from impermissible closing argument." *Rose, supra,* 112 *N.J.* at 518, 548 *A.*2d 1058. The impropriety of those comments is further highlighted by the prosecutor's assertion that Dr. Sadoff "did not consider himself a member of the prosecution team, did not consider himself a member of any team." This statement implied that the defense experts had fabricated testimony in order to "help Leslie Nelson's case" and that the prosecutor's expert was above reproach. Nothing in the record supports the prosecutor's accusations. As in *Rose, supra,* the experts were both well-

qualified and carefully explained the bases for their opinions. Thus, "[w]ithout an adequate foundation in the record, the prosecutor's implication that the expert testimony was contrived was totally unwarranted." *Id.* at 519, 548 *A.*2d 1058 (citing *State v. DiPaglia,* 64 *N.J.* 288, 299–300, 315 *A.*2d 385 (1974) (Clifford, J., dissenting)). Indeed, it appears that the prosecutor's statements were based only on his own opinion.

 Our careful review of the record persuades us that the cumulative effect of the prosecutorial improprieties committed during the prosecution's summation was substantially prejudicial and deprived defendant of her constitutional right to a fair trial. "In the highly emotional setting of the penalty phase of a capital murder case, we cannot conclude that multiple violations of prevailing standards of prosecutorial misconduct had no impact on this jury's deliberations." *Rose, supra,* 112 *N.J.* at 523–24, 548 *A.*2d 1058. Accordingly, we conclude that the prosecutor's statements during the penalty phase requires reversal of defendant's death sentence.

## IV

Defendant claims other miscellaneous errors. Although we find those claims to be without merit, we decide those questions for the guidance of courts that may address similar issues in the future.

### Exclusion of Civil Complaint

At sentencing, defendant moved to admit a civil complaint filed by Jane Norcross against the Camden County Prosecutor, which alleged that inadequate training was a proximate cause of the death of her husband, Officer John Norcross. The sentencing court denied defendant's motion. Defendant now argues that the court erred in refusing to admit the complaint because it prohibited her from presenting the jury with evidence "directly relevant to the inadequate-training mitigator, and [that] also would have recountered the State's attack on the mitigating factor." We disagree.

In *Nelson I, supra,* we reversed defendant's death sentence due to the failure of the prosecution to disclose the civil complaint of Richard Norcross. 155 *N.J.* at 501, 715 *A.*2d 281. There the civil complaint was relevant, admissible evidence that defendant could have used to support her case in mitigation because it lent support to her contention that the police were inadequately trained. *Id.* at 500, 715 *A.*2d 281.

In the present appeal, defendant contends that Jane Norcross' civil complaint against the prosecutor was relevant to her mitigation claim because the complaint alleged inadequate training as the proximate cause of Officer Norcross's death. However, unlike Richard Norcross, Jane Norcross was neither a "key witness" to the events on the day of the crime, nor was she a trained officer. When compared to the opinion of Richard Norcross, the probative value of Jane Norcross's opinion was quite low. Thus, because her opinion of what occurred that day is of little value, we conclude that the trial court did not err in refusing to admit the complaint. Even if the court's refusal to admit the complaint was error, that error was harmless because the evidence could not have substantially altered deliberations. The jury already had before it Richard Norcross's complaint and testimony from Gelles on the inadequate training of the police.

Defendant also asserts that the civil complaint should have been admitted to counter the victim impact statement of Jane Norcross. According to *N.J.S.A.* 2C:11-3c(6), the State may rebut, or counter the weight of, a defendant's character or record evidence by presenting victim impact testimony. However, "the State will not be permitted to elicit testimony concerning the victim's family members' characterizations and opinions about the defendant, the crime, or the appropriate sentence." *State v. Muhammad,* 145 *N.J.* 23, 47, 678 *A.*2d 164 (1996). This limitation applies not only to the State's elicitation of certain testimony, but also to victim impact testimony generally. *Koskovich, supra,* 168 *N.J.* at 502, 776 *A.*2d 144 (stating that *Payne v. Tennessee,* 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), "left undisturbed

the holding in *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987), that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violated the Eighth Amendment") (internal quotations omitted).

Here, Jane Norcross's victim impact statement discussed only her husband's character, interests, education, employment, and the impact of his death on her life. She did not offer an opinion about defendant, the crime, or the appropriate sentence. Thus, her civil complaint against the prosecutor's office would not have been the appropriate vehicle for defendant to rebut the State's presentation of the victim impact testimony.

We note that defendant did not raise the issue whether the trial court erred in not instructing the jury, pursuant to *Koskovich, supra,* not to draw any inferences from the victim impact statement in respect of the witness's preference or non-preference for the death penalty. 168 *N.J.* at 503, 776 *A.*2d 144. However, even if the jury assumed that Jane Norcross implied in her victim impact statement that she preferred the death penalty, the problem would not be the exclusion of her complaint. It still would be improper for the jury to consider the victim's opinion about the circumstances of the crime, and therefore impermissible to consider any rebuttal evidence in respect of that opinion. Further, the sentencing judge instructed the jury to consider the victim impact statement only in determining the weight of the mitigating factors regarding defendant's character or record and not the aggravating factors.

### Excusal of Juror for Cause

We next address the propriety of the trial court's excusal of a venireperson for cause based on her anti-death penalty views and whether the excusal constituted reversible error. Over defense counsel's objection, the court granted the State's motion to excuse prospective juror McCann for cause because her religious views about the death penalty and employment with the Catholic Church would "substantially impair" her ability to follow the

court's instructions and fulfill her oath. Defendant contends that the trial court's excusal of McCann violated defendant's due process rights, her right to a fair trial by an impartial jury, and subjected her to cruel and unusual punishment. In support of her argument, defendant emphasizes McCann's statements during *voir dire* that she could keep an "open mind" concerning the proper sentence for defendant and that she "exhibited a thoughtful approach to capital sentencing."

The question we must resolve is whether the trial court's decision to excuse the venireperson for cause was an abuse of discretion. *Pennington, supra,* 119 *N.J.* at 588, 575 *A.*2d 816; *Ramseur, supra,* 106 *N.J.* at 260, 524 *A.*2d 188. A trial court's determination of juror bias is to be accorded deference in light of the court's ability to observe a juror during voir dire. *Pennington, supra,* 119 *N.J.* at 588, 575 *A.*2d 816. Thus, any doubt must be resolved in favor of the trial court's ruling. *Ibid.*

In reviewing the trial court's determination, "[t]he same test that applies to a juror biased against imposition of the death penalty applies to a juror biased in favor of imposing capital punishment in all murder cases. Neither can serve fairly in the penalty phase." *State v. Williams,* 113 *N.J.* 393, 437–38, 550 *A.*2d 1172 (1988). That test requires us to determine whether the juror's views about capital punishment " 'would prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.' " *Ramseur, supra,* 106 *N.J.* at 255, 524 *A.*2d 188 (quoting *Adams v. Texas,* 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980)).

In *Simon, supra,* 161 *N.J.* at 475, 476, 737 *A.*2d 1, this Court upheld an excusal for cause when a juror voiced his religious concerns in respect of the death penalty, even though he believed that the death penalty was appropriate if a murder was carried out "execution style." Similarly, in *State v. Harris,* 156 *N.J.* 122, 170, 716 *A.*2d 458 (1998), we sustained an excusal for cause where a venireperson said she would impose the death sentence only if

the defendant previously had murdered. We also have declined to find abuse of discretion where a court excused a juror who equivocated on her ability to be impartial. *State v. Feaster*, 156 *N.J.* 1, 55–56, 716 *A.*2d 395 (1998). Therefore, we have upheld consistently a trial court's excusal of a juror when that juror firmly limits the cases in which he or she would impose death before listening to the evidence regarding aggravating and mitigating factors.

In this appeal, whether the venireperson's views in respect of the death penalty would have prevented or substantially impaired her in performing her duties as a juror is a close question. In answering the juror questionnaire, McCann wrote: "My religious beliefs is [sic] against the death penalty. My personal beliefs are different. I think it should depend on the crime." During *voir dire*, she stated that "[s]omeone intentionally taking someone else's life I think is a consideration for the death penalty." When asked if crimes other than murder could qualify a defendant as death-eligible, she responded: "I have a strong feeling against child abuse, but again I'd have to see the pros and cons of the person involved." However, when asked if she had any "personal or religious opinions that would prevent or substantially impair [her] from imposing the death penalty if the facts and circumstances and law justified it," she answered that "[p]robably [her] religious beliefs would overrule [her] personal beliefs." When asked to clarify, she stated: "Well, like I said, it depends on the person's—like if they've planned on killing somebody." With regard to this particular case, the juror stated:

> When I was doing that questionnaire, I wasn't thinking particularly just looking at this case. Maybe I should have, but like I'm not real good at expressing myself, especially when I'm nervous. I think in the whole I could—in this case I could like—probably I was wrong in saying what I said on that paper. I think my religious beliefs would override that because I don't feel it was premeditated, like the events that happened that day. I don't think they were planned.

She further stated that she "would have to have an open mind" about the case if trial evidence convinced her that the murders were in fact planned.

McCann's views indicate that if she did not find premeditation in a case, she would not consider weighing any other factors, even if the law required such a weighing. Indeed, her answers reveal that the trial court may have determined that McCann already had formed a firm conviction about the case, namely, that the murders were not planned or premeditated. Thus, in view of our deference to the trial courts during *voir dire,* we are not convinced that the trial court erred in excusing the juror for cause.

### Right of Allocution Instruction

During the penalty phase, defendant chose to have her attorney read her statement in allocution to the jury instead of reading the statement herself. When the jury inquired during deliberations whether defendant was permitted to read her statement herself, the judge, over defense counsel's objection, answered that she could have read the statement. Specifically, the trial court stated:

> Was Leslie allowed to read the impact statement herself? The answer to that is, yes, she is allowed to read the impact statement herself. However, she requested [defense counsel] to do it for her. Now who reads the impact statement is really not a matter which should enter into your deliberations or considerations in any way but you may consider the substance of the statement and aside from that the manner in [sic] how it was presented to you really shouldn't concern you and shouldn't be a factor in your deliberations.

Defendant now asserts that the trial judge compromised the exercise of her right to allocution in the way it answered the jury's question. According to defendant, the trial court should not have made any reference to the fact that defendant could have personally given the allocution. Instead, the court should have responded with the following: "The manner in which Miss Nelson's statement was presented to the jury is a matter of court procedure with which you should not be concerned and it should not play any part in your deliberations."

Although the right to make a statement in allocution is not constitutionally guaranteed, the right of a capital defendant to allocution has been firmly established. *State v. Bey,* 161 *N.J.* 233, 275, 736 *A.*2d 469 (1999); *State v. Zola,* 112 *N.J.* 384, 429–30, 548 *A.*2d 1022 (1988). The purpose of allocution is to allow a defen-

dant the opportunity to express remorse; it is a proper function of the jury to assess that remorse. *State v. DiFrisco*, 137 *N.J.* 434, 478–79, 645 *A.*2d 734 (1994). Nevertheless, a trial court has discretion in addressing issues relating to allocution. *State v. Loftin*, 146 *N.J.* 295, 363, 680 *A.*2d 677 (1996); *DiFrisco, supra*, 137 *N.J.* at 479, 645 *A.*2d 734.

We agree that the trial court's instruction may have negatively impacted defendant when the court informed the jury that defendant was permitted to read her allocution statement but chose not to do so. It may well have been that defendant believed that personally addressing the jury would not have received a sympathetic eye or ear. The instruction may have conveyed the implication that defendant was reluctant to present herself personally, was unwilling to speak to the jury and accept responsibility for her action, or otherwise had something to conceal.

A purpose of the allocution statement is to allow the jury to hear a defendant express remorse in his or her own voice. *State v. DiFrisco*, 137 *N.J.* 434, 478, 645 *A.*2d 734 (1994); *State v. Zola*, 112 *N.J.* 384, 428–431, 548 *A.*2d 1022 (1988) (citing *Green v. United States*, 365 *U.S.* 301, 81 *S.Ct.* 653, 5 *L.Ed.*2d 670 (1961) (Frankfurter, J., plurality opinion)). According to that purpose, the manner in which the statement is presented is usually pertinent to jurors' deliberations. Here, however, because of the unusual circumstances regarding defendant's appearance and her particular problems with social interaction, perhaps it was appropriate for the trial court to take the measures necessary to have the jury not consider that defendant chose to have her attorney read her statement. Nevertheless, regardless of the potential impact of informing the jury that defendant could have read her statement, we are satisfied with the court's instruction to the jury that it should not consider who gave the allocution statement. The court instructed the jury to consider the statement's content only. Because we presume the jury followed that instruction, *State v. Manley*, 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969), we do not find error.

*Inflammatory Testimony*

At defendant's first penalty-phase trial, defendant made a motion *in limine* in respect of the testimony of Detective Richard Norcross and Officer Joseph Downs. The court limited the scope of Norcross's testimony to his observations of McLaughlin's shooting, how many times and where he was shot, defendant's actions in pursuing him down the steps and shooting at him, and Investigator McLaughlin's attempt to escape on his elbows. The court excluded Detective Norcross' testimony regarding Norcross' collapse and officers coming to his aid, his treatment at the hospital, the number and nature of his gunshot wounds, and his forced retirement. In respect of Officer Downs' testimony, the court permitted him to discuss his activities outside the Nelson residence, his observation of Norcross leaving the residence, Norcross' apparent injuries, that Norcross sought cover, that defendant fired shots during the entire time, and that Norcross was picked up by another patrol car and taken away from the scene. Defendant now argues that the trial court abused its discretion in admitting the testimony and in failing to give a curative instruction.

In general, a trial court is afforded "considerable latitude regarding the admission of evidence," and is to be reversed only if the court abused its discretion. *Feaster, supra*, 156 *N.J.* at 82, 716 *A.2d* 395. In a capital sentencing trial, admissible evidence includes that evidence relating to the aggravating and mitigating factors at issue. *Biegenwald, supra*, 106 *N.J.* at 71, 524 *A.2d* 130. In assessing the probative value and the risk of undue prejudice under *N.J.R.E.* 403, the trial court has discretion to make appropriate determinations and will be reversed only if "the trial court's ruling 'was so wide of the mark that a manifest denial of justice resulted.'" *State v. Brown*, 170 *N.J.* 138, 147, 784 *A.2d* 1244 (2001) (quoting *State v. Marrero*, 148 *N.J.* 469, 484, 691 *A.2d* 293 (1997)) (quoting *State v. Kelly*, 97 *N.J.* 178, 216, 478 *A.2d* 364 (1984)).

▰▰▰▰ Here, defense counsel objected to one portion of the aforementioned testimony but did not object to the remainder. Counsel's only objection came after Officer Sack was asked if he knew that he was endangering himself when he looked out from behind cover. However, because the trial court sustained the objection, defendant may not now assert that the trial court abused its discretion in allowing the remaining testimony. Defendant also claims that the court erred in failing to give a curative instruction after Officer Sack acknowledged that he was putting himself in danger. Because defendant did not request a curative instruction, the lack of instruction is error only if it constitutes plain error, that is, error producing an unjust result. *State v. Mays,* 321 *N.J.Super.* 619, 633, 729 *A.*2d 1074 (App.Div.1999). When evaluating whether the failure to give an instruction was error, a reviewing court "owe[s] some degree of deference to counsel's strategic or tactical decisions[.]" *Ibid.* Based on that reasoning, and in light of the fact that the jury would not be surprised that Officer Sack believed it was dangerous to come out from behind cover, the lack of a curative instruction regarding his testimony is not "capable of producing an unjust result." See *R.* 2:10–2.

▰▰▰ Defendant also did not object to any of the other allegedly inflammatory testimony. Thus, we analyze the admission of the testimony under the plain error standard. Defendant's lack of objections, particularly when considered in light of the careful attention paid to potential testimony during the motion *in limine* colloquy, weighs against defendant's claim that errors were "clear" or "obvious." Indeed, "[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." *State v. Macon,* 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971).

We therefore conclude that none of the testimony about which defendant complains was sufficient to divert the jury's attention from its responsibility as described by the trial court's instruction to "not consider anything else as leaning in favor of the death

sentence other than the aggravating factor I've just described and then only proven beyond a reasonable doubt."

### Miscellaneous Prosecutorial Comments

Defendant contends that, apart from the comments discussed in Section III, *supra*, other portions of the prosecutor's summation deprived her of a fair penalty trial and constituted reversible error. Specifically, defendant argues that the prosecutor made statements that (1) undercut the value of defendant's guilty plea and parole waiver; (2) improperly characterized the action by the police as courageous and heroic; (3) suggested that the jury must sentence defendant to death; and (4) purported to represent the legislative intent behind the capital sentencing statute.

 Although generally limited to commenting on the evidence and drawing reasonable inferences from the proofs presented, prosecutors are permitted considerable leeway to make forceful, vigorous arguments in summation. *State v. Chew*, 150 *N.J.* 30, 84, 695 *A.2d* 1301 (1997). On review, a court must assess the prosecutor's comments in the context of the entire trial record. *State v. Morton*, 155 *N.J.* 383, 419–20, 715 *A.2d* 228 (1998). Even where a prosecutor's statements amount to misconduct, that misconduct will not be grounds for reversal "unless it was so egregious as to work a deprivation of a defendant's right to a fair trial." *Pennington, supra*, 119 *N.J.* at 566, 575 *A.2d* 816.

 We first address the prosecutor's statements in respect of defendant's guilty plea. Specifically, the prosecutor stated that defendant

had an absolute right to make any reasonable defense she chooses to make on her behalf. But there's no issue, ladies and gentlemen, I suggest to you as to what happened, how it happened or who did it and no issue as it turns out regarding her responsibility. It's clear, it was pointed out to you at the beginning of the case. You heard from the doctors. Nobody has suggested to you that there's any psychiatric or psychological defense to the actions of [defendant]. No one suggested that at all.

So what is noble about the plea? Is it something you can infer that [defendant] did because it's the right thing to do? Is it something you can infer she did because the options were few and she thought it was in her best interest to do so?

The above statements were made in response to defense counsel's summation during which counsel argued that defendant's plea was an acceptance of responsibility. Thus, the prosecutor's statements must be considered in that context. *Morton, supra,* 155 *N.J.* at 457, 715 *A.*2d 228 (stating that court must assess prosecutor's allegedly prejudicial comments in context of entire trial record and holding that it was permissible for prosecutor to refer to defendant as "cold-blooded killer" in response to defense summation that defendant's stoic demeanor indicated that cohort committed the murder).

The prosecution is allowed to consider other interpretations of defendant's plea and show less reverence to it than the defense. A prosecutor may respond to defense claims, even if the response tends to undermine the defense case. *Morton, supra,* 155 *N.J.* at 457, 715 *A.*2d 228. "It is not improper for the prosecution to suggest that the defense's presentation was imbalanced and incomplete." *Timmendequas, supra,* 161 *N.J.* at 593, 737 *A.*2d 55. In fact, it is entirely proper for the prosecutor to ask the jury to infer that defendant had his or her own reasons for pleading guilty.

Here, the prosecutor's statements regarding defendant's plea agreement were permissible. Further, the prosecutor's statements characterizing defendant's waiver of parole as no "major concession" did not result in prejudicial error in view of defense counsel's statement in his summation that defendant "was obviously looking at 65 years without parole anyway." In any event, no harm resulted because the jury found the mitigating factor of acceptance of responsibility.

Defendant also objects to the prosecutor's characterization of the police officers as courageous and heroic. However, defendant put the conduct of the officers squarely in issue in her mitigation case. The thrust of her defense was that the police were inept and foolhardy and that their inadequate training contributed to or triggered defendant's actions. For example, on

direct-examination, Dr. Gelles testified that the police had not assessed properly the threat communicated verbally and behaviorally by defendant. According to Dr. Gelles, the officers failed to appreciate the significance of defendant's prior arrest and failed to interpret the larger danger embodied in defendant's suicide threat. The prosecutor's statements were merely an alternate characterization in rebuttal of defendant's argument that the police were inadequately trained.

Defendant further asserts that the prosecutor implied that the jurors must sentence defendant to death or they would otherwise betray their oaths. Contrary to defendant's contentions, however, at no point in the summation did the prosecutor urge the jury to deliver a death sentence. Rather, he asked the jurors to deliberate to reach their verdict because it was important, and whatever the outcome, it would be the "ultimate justice."

Defendant's arguments in respect of the prosecutor's comments about the "murder within the course of murder" aggravating factor and the murder of the police officer aggravating factor are similarly meritless. The prosecutor is entitled to argue the weight to be accorded an aggravating factor. In any event, the jury did not approve unanimously the "murder within the course of murder" aggravating factor.

We also reject defendant's contention that the prosecutor improperly invoked the intent of the Legislature. Defendant assumes wrongly that the prosecutor had no right to argue that a death sentence was appropriate. Indeed, because a prosecutor may argue that a death sentence is appropriate, he clearly may insinuate as much.

Finally, it was not error for the prosecutor to inform the jury that public servants are granted additional protections, because this information merely reiterates the murder of a police officer aggravating factor.

### Change of Venue

■ Defendant's first trial took place in Camden County, but the parties agreed to impanel a foreign jury from Mercer County as a result of a significant amount of pretrial publicity. Before her second sentencing trial, defendant moved for a change of venue to Burlington County because of the amount and type of publicity generated by her first trial and the reversal of the sentence imposed. The trial court denied defendant's motion. Defendant now asserts that the trial court committed prejudicial error.

■ *Rule* 3:14–2 requires a change of venue where the trial court "finds that a fair and impartial trial cannot otherwise be had." In *State v. Williams*, 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983), we recognized the constitutional significance of an impartial jury and that "[t]his requirement of fairness . . . is heightened in cases in which the defendant faces death." In determining whether a change of venue is necessary, a court must consider whether the change of location is "necessary to overcome the realistic likelihood of prejudice resulting from pretrial publicity[.]" *Id.* at 67–68, 459 *A.*2d 641 n. 13; see also *Koedatich, supra,* 112 *N.J.* at 267, 548 *A.*2d 939. We have stated that that determination must account for

> [t]he distinction . . . between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel.
>
> [*Biegenwald, supra,* 106 *N.J.* at 33, 524 *A.*2d 130 (citations omitted).]

■ Cases in which prejudice is presumed are "relatively rare and arise out of the most extreme circumstances." *Koedatich, supra,* 112 *N.J.* at 269, 548 *A.*2d 939. "Presumptively prejudicial publicity" means a "torrent of publicity that creates a carnival-like setting" or "a barrage of inflammatory reporting that may but need not include all of the following: evidence that would be inadmissible at the trial, editorial opinions on guilt or innocence, and media pronouncements on the death-worthiness of a defendant." *Harris, supra,* 156 *N.J.* at 143, 147–48, 716 *A.*2d 458.

The existence of such presumed prejudice obviates the need for conducting *voir dire.* In *Koedatich, supra,* we set forth a non-exhaustive list of factors to be considered in determining whether presumed prejudice exists:

(1) evidence of extreme community hostility against defendant;

(2) prominence of either the victim or defendant within the community;

(3) the nature and extent of news coverage;

(4) the size of the community;

(5) the nature and gravity of the offense; and

(6) the temporal proximity of the news coverage to the trial.

[112 *N.J.* at 282–84, 548 *A.*2d 939.]

An example of presumed prejudiced is illustrated in *Rideau v. Louisiana,* 373 *U.S.* 723, 83 *S.Ct.* 1417, 10 *L.Ed.*2d 663 (1963) where the defendant's confession was televised three times to tens of thousands of viewers. In that case, the United States Supreme Court stated:

[W]e do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.' 'Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death.'

[373 373 *U.S.* 723, 727, 83 *S.Ct.* 1417, 1420, 10 *L.Ed.*2d 663, 666 (1963) (quoting *Chambers v. Florida,* 309 *U.S.* 227, 241, 60 *S.Ct.* 472, 479, 84 *L.Ed.* 716, 724 (1940)).]

■ If prejudice is not presumed, a court must evaluate whether under the totality of circumstances "the jury process resulted in a fair and impartial jury" to determine if a change of venue is necessary to overcome the realistic likelihood of prejudice. *Koedatich, supra,* 112 *N.J.* at 274, 548 *A.*2d 939 (citation omitted). In making that determination, a court "must examine [through *voir dire*] the extent to which potential jurors are biased as a result of any publicity surrounding the case." *Ibid.* " '[T]he trial court's resolution of such questions is entitled, even on direct appeal, to special deference.' " *Ibid.* (quoting *Patton v. Yount,* 467 *U.S.* 1025, 1038–39, 104 *S.Ct.* 2885, 2892, 81 *L.Ed.*2d 847, 858 (1984)) (internal quotations omitted). Therefore, we "ordinarily will affirm a trial court's determinations regarding appropriate

prophylactic measures unless they constitute an abuse of discretion." *Feaster, supra,* 156 *N.J.* at 51, 716 *A.*2d 395.

In *Patton, supra,* the defendant was tried a second time for rape and murder after his first conviction was overturned due to *Miranda* violations. Although the defendant's first trial received a barrage of publicity, the second trial did not. In affirming the second trial court's denial of the defendant's motion for a change of venue, the United States Supreme Court cited the lack of publicity during the second trial. As evidenced by the *voir dire* record, the Court stated that the passage of time had softened or effaced the community's opinion.

In *Murphy v. Florida,* 421 *U.S.* 794, 799, 95 *S.Ct.* 2031, 2036, 44 *L.Ed.*2d 589, 594 (1975), the Court noted that federal precedent does not imply that juror knowledge of a defendant's prior conviction or news accounts of the crime creates presumptive prejudice. Although the trial at issue had generated significant publicity, the Court did not find a presumptively prejudicial atmosphere where newspaper articles were "largely factual," *voir dire* did not indicate partiality against the defendant, and seven months had passed since the media coverage.

In the present case, contrary to defendant's contentions, prejudice, presumed or actual, did not exist. The lack of presumed prejudice is illustrated by defense counsel's statement at the motion hearing that the court could not be sure of the jurors' biases until *voir dire.* Further, the passage of time and the factual nature of the media coverage of defendant's trial dissipates any concern that prejudice existed. As noted by the trial court, the newspaper articles offered by defendant as evidence of prejudicial pretrial publicity focused primarily on mitigating evidence such as defendant's bizarre behavior. In addition, only one article was submitted that was published after 1997, the articles did not express hostility toward defendant, and none of the jurors had read the recent articles. Indeed, the second trial did not receive significant media coverage.

Also, the pool of eligible jurors was large enough to protect defendant's rights and the trial court allowed the excusal for cause of jurors who were aware of defendant's previous sentence. Although jurors must be impartial, they "need not be ignorant of the facts of the case.... 'It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court.'" *Koedatich, supra,* 112 *N.J.* at 275, 548 *A.*2d 939 (quoting *State v. Sugar,* 84 *N.J.* 1, 23, 417 *A.*2d 474 (1980)). In any event, the jurors were properly and thoroughly instructed to avoid media accounts and to consider only relevant evidence. Jurors are presumed to follow instructions. *Manley, supra,* 54 *N.J.* at 270, 255 *A.*2d 193.

In balancing the *Koedatich* factors, the absence of evidence of extreme community hostility, the size of the Camden County jury pool, and the passage of time since most of the news coverage weigh in favor of the State's position. Although the prominence of defendant and her victims and the nature of the crime may weigh in favor of defendant's position to change venue, the factors in favor of the State outweigh them. Those factors do not create the "carnival-like setting" necessary to the existence of presumed prejudice. *Harris, supra,* 156 *N.J.* at 143, 716 *A.*2d 458.

V

Defendant also contends that her execution for a crime that is intertwined with her mental illness violates our State Constitution. Because we reverse defendant's death sentence for the reasons set forth in Part II *supra,* the Court need not reach that question.

VI

Defendant's claims raised in her *pro se* brief are without merit and do not warrant discussion.

The life sentence for the murder of Officer John McLaughlin remains in force. Defendant's death sentence for the murder of

Officer John Norcross is set aside and the matter is remanded to the trial court for proceedings consistent with this opinion.

*Superior Court of New Jersey*
*Law Division—Camden County*
*Criminal*
*1–1468–06–95*

STATE OF NEW JERSEY :

vs. : *VERDICT SHEET*

LESLIE ANN NELSON :

Defendant. :

## 1. *AGGRAVATING FACTORS*

Do you unanimously find beyond a reasonable doubt that *any* of the following aggravating factors exist:

Yes __X__ No____

[Indicate the number of "No" and "Yes" votes]

a. The murder of John Norcross was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant, the other offense being the unlawful possession of an assault firearm.

| # No | # Yes |
|------|-------|
| (0) | (12) |

b. The murder of John Norcross was committed while the defendant was engaged in the commission of the murder of John McLaughlin

| # No | # Yes |
|------|-------|
| (1) | (11) |

c. John Norcross was a public servant engaged in the performance of his official duties when the murder occurred.

| # No | # Yes |
|------|-------|
| (0) | (12) |

If you have found that none of the aggravating factors were present, the deliberation is complete and the punishment shall be imprisonment for life without the possibility of parole.

If you have unanimously found that one or more aggravating factors were present, go to number "2" below

2. *MITIGATING FACTORS*

Do any of you find that any of the following exist as mitigating factors:
(You should note that there is no burden of proof as to mitigating factors. They need only be established by reliable evidence. Unanimity is *not* required)
 a. Ms. Nelson pled guilty and has accepted responsibility for her actions.

 # No # Yes
 (0) (12)

 b. Ms. Nelson has given up her right under the law to be eligible for parole after 30 years for the murder of John Norcross and has agreed to accept a sentence of life without the possibility of parole in the event she is not sentenced to death.

 # No # Yes
 (0) (12)

 c. Ms. Nelson had no significant history of violent behavior at the time of the murders.

 # No # Yes
 (12) (0)

 d. Ms. Nelson has no significant history of criminal activity.

 # No # Yes
 (12) (0)

 e. Ms. Nelson's conduct was not the result of planning or premeditation.

 # No # Yes
 (12) (0)

f. Ms. Nelson has a long history of mental illness or psychological problems that contributed to her conduct on the day of the murders.

# No # Yes
(1) (11)

g. Ms. Nelson's psychological or psychiatric make-up made her susceptible to an emotional breakdown and loss of judgment and reason on the day of the murders.

# No # Yes
(4) (8)

h. The inadequate training, support and/or guidance provided by the law enforcement officers involved in the events of April 20, 1995 contributed to the circumstances leading to the murders.

# No # Yes
(8) (4)

i. Ms. Nelson's actions were in part triggered by the conduct of law enforcement.

# No # Yes
(8) (4)

j. Ms. Nelson is making a positive contribution to prison life through her participation in the institution's educational program and her legal assistance to other inmates.

# No # Yes
(0) (12)

k. Ms. Nelson was gainfully employed for most of her adult life.

# No # Yes
(12) (0)

l. Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.

NO

[Each mitigating factor alleged under (*l*) should be listed separately]

### Decision of the jury

Indicate below *one, and only one,* choice which is the decision of the jury. Please check the appropriate box.

a. The jury is unanimously satisfied that any aggravating factor or factors proven to exist fail to outweigh beyond a reasonable doubt the mitigating factor or factors. The punishment shall be imprisonment for life without the possibility of parole.

—————————

b. The jury is unanimously satisfied beyond a reasonable doubt that any aggravating factor or factors proven to exist outweigh the mitigating factor or factors. The judge will sentence the defendant to death.

———— X ————

If you have unanimously found more than one aggravating factor present, then indicate as to each factor whether it, by itself, outweighs the mitigating factors beyond a reasonable doubt:

*Aggravating Factor "a"* *No (0)* *Yes (12)*

*Aggravating Factor "b"* *No (1)* *Yes (11)*

*Aggravating Factor "c"* *No (0)* *Yes (12)*

c. After due deliberation the jury cannot unanimously agree upon punishment. The punishment shall be imprisonment for life without the possibility of parole.

—————————

—————————————
*Foreperson*

ZAZZALI, J., concurring.

In addition to the reasons set forth above, there is an additional and compelling justification for not executing Leslie Nelson. I therefore write separately.

I agree with defendant that her execution for crimes that are inextricably bound to her mental illness violates our State Constitution. The State's legitimate penological interests that purportedly are served by the death penalty are unconstitutionally diminished if the State executes such a mentally ill and psychologically disturbed person. In defendant's case, it is constitutionally inadequate for a jury to consider her severe mental illness as merely a mitigating factor to be weighed among other aggravating and mitigating factors.

Both the federal and state Constitutions prohibit cruel and unusual punishment. *U.S. Const.* amend. VIII; *N.J. Const.* art. I, ¶ 12. To give the federal prohibition a "vital" interpretation, the United States Supreme Court has stated that it "may be ... progressive, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems v. United States,* 217 *U.S.* 349, 378, 30 *S.Ct.* 544, 553, 54 *L.Ed.* 793, 803 (1910). Thus, the Supreme Court has held that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958). Our Court follows the same principles in interpreting our State's prohibition against cruel and unusual punishment. *See Ramseur, supra,* 106 *N.J.* at 171, 524 *A.*2d 188.

With the principles of evolving standards of decency in mind, the United States Supreme Court fashioned a three-prong analysis for determining whether a punishment constitutes cruel and unusual punishment under the Eighth Amendment. *Gregg v. Georgia,* 428 *U.S.* 153, 173, 96 *S.Ct.* 2909, 2925, 49 *L.Ed.*2d 859, 874–75 (1976) (plurality opinion). New Jersey has adopted the same test: "First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?" *Ramseur, supra,* 106 *N.J.* at 169, 524 *A.*2d 188 (citing *Gregg, supra,* 428 *U.S.* at 173, 96 *S.Ct.* at 2925, 49 *L.Ed.*2d at 874–

75). Because the death penalty is not grossly disproportionate to murder, I focus here only on the first and third prongs of the analysis. See *State v. Koskovich,* 168 *N.J.* 448, 553, 776 *A.*2d 144 (2001) (Zazzali, J., concurring).

### Contemporary Standards

In assessing the first prong, whether contemporary standards permit the execution of such a mentally disturbed person, we look to objective indicators of those standards. *Ramseur, supra,* 106 *N.J.* at 172, 524 *A.*2d 188. We have held, and continue to endorse, that acts of the Legislature are "[o]ne of the strongest indicators" of contemporary standards. *Ibid.* The sentiments implied by acts of the Legislature provide "presumptive evidence" of New Jersey citizens' views on permissible and impermissible punishments. *Ibid.*

New Jersey's death penalty statute, *N.J.S.A.* 2C:11–3, suggests that contemporary standards might permit the execution of a severely mentally ill person. The provision specifying the statutory aggravating and mitigating factors indicates that the Legislature finds it legally sufficient for the penalty-phase jury or court to consider a capital defendant's possible mental defects and illnesses as a mitigating factor, which, along with other mitigating factors, may be outweighed by aggravating factors under certain circumstances. *N.J.S.A.* 2C:11–3c(5)(d)(5d). 5d allows the sentencer to consider whether a "defendant's capacity to appreciate the wrongfulness of his [or her] conduct or conform his [or her] conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution." *Ibid.* Even if the sentencing body finds credible evidence to support the 5d factor, the statutory scheme permits imposition of the death penalty provided a mentally defective defendant's act of murder was sufficiently aggravated.

Although the capital murder statute's scheme is a strong indication of community standards, it does not, by itself, settle the issue. See *Ramseur, supra,* 106 *N.J.* at 172, 524 *A.*2d 188 (stating that

passage of death penalty statute "cannot be dispositive" in assessing constitutionality of death penalty because "[s]uch an interpretation would render the constitutional ban on cruel and unusual punishments a mere tautology, eliminating its function as a limitation on legislative power"). Although the Legislature's enactments provide strong evidence of contemporary standards, other considerations are also relevant. *Ibid.* (stating that statutory enactments provide "presumptive" evidence of contemporary standards). In respect of the present matter, there are objective indicators of contemporary standards that reflect a growing concern about the execution of the mentally disturbed.

Our society has demonstrated increased awareness of, and sensitivity to, the problems facing the mentally ill. Apart from common experience, trends in jury verdicts, although not conclusive, reflect that heightened sensitivity. Chief Justice Rehnquist, in his dissent in *Atkins v. Virginia*, stated:

> Our opinions have also recognized that data concerning the actions of sentencing juries, though entitled to less weight than legislative judgments, " 'is a significant and reliable index of contemporary values,' " *Coker v. Georgia*, 433 *U.S.* 584, 596, 97 *S.Ct.* 2861, 53 *L.Ed.*2d 982 (1977) (plurality opinion) (quoting *Gregg, supra*, at 181, 96 *S.Ct.* 2909), because of the jury's intimate involvement in the case and its function of " 'maintain[ing] a link between contemporary community values and the penal system,' " *Gregg, supra*, at 181, 96 *S.Ct.* 2909 (quoting *Witherspoon v. Illinois*, 391 *U.S.* 510, 519, n. 15, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1968)).
>
> [*Supra*, —— *U.S.* ——, ——, 122 *S.Ct.* 2242, 2253, 153 *L.Ed.*2d 335, —— (2002) (Rehnquist, C.J., dissenting).]

*See also Coker v. Georgia*, 433 *U.S.* 584, 596, 97 *S.Ct.* 2861, 2868, 53 *L.Ed.*2d 982, 992 (1977) (plurality opinion) (stating that because juries are a reliable objective index of contemporary values, "it is ... important to look to the sentencing decisions that juries have made in the course of assessing whether capital punishment is an appropriate penalty for the crime being tried").

An examination of jury verdicts in New Jersey capital sentencing trials in which juries have found the 5d mitigating factor shows that attitudes toward those with mental illness or defects are evolving, with a growing reluctance to execute those whose mental disease or defect or intoxication contributes to their difficulty in

reasoning about what they are doing.[1] From 1983, when the death penalty was reinstated in New Jersey, through 1989, juries sentenced to death 17.4% of capital defendants after finding evidence to support the 5d mitigating factor. During that period, juries sentenced to death 29.8% of all defendants at capital sentencing trials and sentenced 39.7% of capital defendants when 5d was not found. From 1990 to 2001, the rate of jury-imposed death verdicts increased to 31.3% overall, and to 42.6% for defendants when 5d was not found. However, in that same time period juries that found the 5d mitigating factor sentenced only 7.7% of those defendants to death.[2] Importantly, the overall rate of death sentences increased, but the rate of sentencing 5d defendants decreased by more than half.

Moreover, the Administrative Office of the Courts (AOC) evaluates the evidence that would have been presented at trial for death-eligible defendants who are sentenced to life without a penalty phase. For each settled case, the AOC makes a judgment regarding what aggravating and mitigating factors would have been found by jurors if a penalty trial had been conducted. From 1990 to 2001, the AOC found credible support for the 5d mitigating factor with regard to one-hundred sixteen capital defendants who received a life sentence without a penalty trial. When added to the capital defendants for whom sentencing juries have found the 5d mitigating factor, there have been one-hundred forty-one 5d capital defendants since 1990, not including defendant: only one of those one-hundred forty-one defendants has received the death penalty. As stated, defendant did not rely on the precise wording of the 5d mitigating factor. Rather, she submitted, and eleven jurors found, that she "ha[d] a long history of mental illness or psychological problems that contributed to her conduct." In

---

[1] The percentages reported in this section were calculated based on the data provided by the Administrative Office of the Courts, Criminal Practice Division, from its proportionality review database. The data was last updated in 2001.

[2] This calculation includes Nelson as a defendant who received death after a jury found 5d.

addition, eight jurors found that "defendant's psychological or psychiatric make-up made her susceptible to an emotional break-down and loss of judgment and reason." Thus, including defendant in the group of 5d defendants yields two of one-hundred forty-two 5d capital defendants who have received the death penalty since 1990. In other words, only 1.4% of the significant pool of 5d capital defendants have received death in the past twelve years.[3]

Notably, prosecutors have sought the death penalty at a significantly decreased rate for defendants who can present evidence in support of the 5d mitigating factor. From 1983 to 1989, there were eighty-two capital defendants who either successfully presented evidence of 5d to jurors or, if they did not go to trial, the AOC determined that they could have successfully presented 5d evidence. Prosecutors sought the death penalty for 46 of those 82 defendants, reflecting a rate of 56.1% of 5d defendants. From 1990 to 2001, that rate at which prosecutors sought the death penalty for all 5d defendants decreased to 18.3% (twenty-six out of one-hundred forty-two 5d capital defendants, including defendant). During that same period, prosecutors sought the death penalty for 29.3% of capital defendants who either did not present or demonstrate the 5d mitigator to a jury or, if they did not go to trial, who the AOC determined could not have successfully presented evidence in support of 5d.[4]

The jury trends are not syllogisms that require the conclusion that the death penalty is in disfavor in this State, but they do suggest an evolving aversion in our community to subjecting defendants with mental disease or defects to execution. Although

---

[3] From 1983 to 1989, 9.8% of all 5d defendants, including those who did not go to trial, received a death sentence.

[4] During the 1980's, the rate at which prosecutors sought the death penalty for 5d defendants was slightly higher than the rate at which they sought the death penalty for non–5d capital defendants (56.1% versus 54.2%). As stated, from 1990 to 2001, the rate at which prosecutors sought capital punishment for 5d defendants was lower than the rate for non–5d defendants (18.3% versus 29.3%).

the message of the jury statistics might not be sufficient to show that a majority of New Jersey citizens oppose the execution of a severely mentally ill person whose actions are intricately connected to her mental illness, it is nonetheless clear that contemporary standards are evolving with an increased compassion for those with mental illness.

### Penological Objectives

Against the background of evolving contemporary standards, the third prong of the constitutional test may now be considered— whether the execution of defendant is necessary to accomplish a legitimate penological objective. "The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg, supra,* 428 *U.S.* at 183, 96 *S.Ct.* at 2929–30, 49 *L.Ed.*2d at 880. "Unless the death penalty measurably contributes to one or both of those goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence is an unconstitutional punishment." *State v. Marshall,* 130 *N.J.* 109, 190, 613 *A.*2d 1059 (1992), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993) (*Marshall II*) (quoting *Coker, supra,* 433 *U.S.* at 592, 97 *S.Ct.* at 2866, 53 *L.Ed.*2d at 989).

I believe that the death penalty is unconstitutional as applied to defendant because it would exceed what is necessary to accomplish either retribution or deterrence. The retributive value to be gained from her execution is unacceptably reduced by "her bizarre psychological derangement and profound emotional disturbance." *Nelson, supra,* 155 *N.J.* at 517, 715 *A.*2d 281 (Handler, J., concurring and dissenting). In addition, the fear of execution, while possibly serving as a deterrent under some circumstances with some individuals, cannot plausibly be thought to provide a deterring reason to mentally ill persons moved by irrational and delusional motives.

### Retribution

I do not conclude that the death penalty is unconstitutional as applied to *all* capital defendants diagnosed with some mental

illness or disorder. The United States Supreme Court has held that the execution of mentally retarded defendants violates the Constitution; some state courts have held similarly in respect of their state constitutions. See *infra* at 483, 803 *A.*2d at 41. I am not suggesting an analogous prohibition with regard to the mentally ill. As the Tennessee Supreme Court recognized, "[m]ental retardation, by definition, is accompanied by serious limitations on intelligence and adaptive behavior; mental illness is not." *Van Tran v. State*, 66 *S.W.*3d 790, 810 (Tenn.2001). However, defendant's mental illness and psychological problems, and their connection to her violent reaction to the police, demonstrate that her capacities were too diminished to justify her execution. As discussed, defendant was emotionally disturbed throughout her childhood and mentally ill in her adolescence and adult years. She was obsessed with and threatened to commit suicide. She was involuntarily committed to a psychiatric facility and eventually underwent a sex change operation. Defendant, who had no significant interpersonal relationships in her life, except with her mother, and who showed no interest in forging interpersonal relationships, according to her psychiatric diagnoses, stated that she wanted to undergo sex reassignment surgery to become an exotic dancer, adult film actress, or prostitute. Defendant obsessed for years about going through radical sex change surgery to seek human contact in these forms, despite eschewing any other form of social relationship.

### By way of background

[w]ithout sufficient psychological basis, in 1992, defendant underwent sexual reassignment surgery—removing her male genitalia and constructing female genitalia in its place—in an attempt to redress her social problems with being an outcast and a loner. Unlike most people who undergo the surgery as a remedial response to transexuality, defendant did not have the clinically accepted conditions of transsexualism. She did not harbor the persistent, unshakeable sense that she was truly a female even though physically she was a male—that she was a woman "trapped" in a man's body. Defendant did not want to become a woman in order to reconcile her physical gender with her psychological gender.

[*Nelson, supra,* 155 *N.J.* at 516, 715 *A.*2d 281 (Handler, J., concurring and dissenting).]

Indeed, the defense expert testified that being mentally ill calls into question the reasons one pursues that kind of surgery.

Ridiculed by members of her family and co-workers, her depression deepened. The expert opinions offered at trial did not depart from the diagnoses included in Nelson's mental health records. Nelson was consistently diagnosed with dysthymia[5]—a long standing depression, which Dr. Weiss opined was a major depression at the time of the murders—as well with traits from been previously diagnosed with post-traumatic stress disorder[6] and with problems of social withdrawal, delusions, paranoia, and schizoid[7] and borderline[8] personality disorders. She also had anxiety.

---

[5] "The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years," and there are other symptoms, possibly including poor appetite, low energy, low self-esteem, insomnia or hypersomnia, and feelings of hopelessness. *DSM–IV* at 345.

[6] The following are the criteria for post-traumatic stress disorder: (1) responding with intense fear, helpless, or horror to threatened or actual physical harm, (2) persistently reexperiencing the event in or more of certain specified ways, (3) persistent avoidance of associated stimuli, and (4) persistent symptoms of increased arousal, such as difficulty sleeping, irritability or outbursts of anger, difficulty concentrating, and/or exaggerated startle responses. *Id.* at 427–28.

[7] "The essential feature of Schizoid Personality Disorder is a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings. This pattern begins by early childhood and is present in a variety of contexts." *Id.* at 638. Schizoid Personality Disorder: "Particularly in response to stress, individuals with this disorder may experience very brief psychotic episodes (lasting minutes to hours). In some instances, Schizoid Personality Disorder may appear as the premorbid antecedent of Delusional Disorder or Schizophrenia. Individuals with this disorder may sometimes develop Major Depressive Disorder." *Id.* at 639.

[8] "The essential feature of Borderline Personality Disorder is a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that beings by early childhood and is present in a variety of contexts." *Id.* at 650. Multiple symptoms are necessary, and may include the following: (1) identity disturbance: markedly and persistently unstable self-image or sense of self; (2) impulsivity in at least two areas that are self-damaging; (3) recurrent suicidal behavior; (4) affective instability; (4) chronic

Evaluations suggested that she could become depressed severely enough to injure others.

In defendant's view, the police officers' actions, although certainly justified, threatened the loss of all that she found meaningful and everything that was essential to her immature and unstable sense of self, namely, her guns and her womanhood. Defendant knew the officers would confiscate the objects she treated like her children, and that she would be sent to prison.

The psychiatric experts agreed that at the time of the murders, defendant was "suffering from an episode of major depression." The defense psychiatrist agreed that her long history of mental illness and psychological problems contributed to her condition on the day of the murders. He also agreed that defendant's psychological and psychiatric makeup made her susceptible to an emotional breakdown and loss of judgment and reason on the day of the murders, so much so that defendant was at the point of suicide on that day. Importantly, the State's expert, Dr. Sadoff, testified that defendant's depression, her obsession with her appearance as a woman, and her bizarre attachment to her guns seriously affected her ability to make reasoned judgments: "[Defendant] had an impairment of her judgment at the time because of her condition, which made her more vulnerable to a partial breakdown or an impairment of her judgment more than the average person." Dr. Sadoff added that defendant's "ability to think clearly was impaired [in part] both by her anxiety and her depression." He acknowledged that defendant's fear of prison, where she could not

---

feelings of emptiness; (8) inappropriate, intense anger or difficulty controlling anger; (5) transient, stress-related paranoid ideation. *Id.* at 654.

Borderline Personality Disorder: "Some individuals develop psychotic-like symptoms (e.g., hallucinations, body-image distortions, ideas of reference, and hypnagogic phenomena) during times of stress. Individuals with this disorder may feel more secure with transitional objects (i.e., a pen or inanimate possession) than in interpersonal relationships. Premature death from suicide may occur in individuals with this disorder, especially those with co-occurring Mood Disorders[, which include depressive disorders,] or Substance–Related Disorders." *Id.* at 652.

maintain her appearance as a woman and contact with her guns, "was above and beyond the normal fear that anyone would have of going to jail because of her condition." Defendant's expert agreed, testifying that the threatened loss of the only objects connected to defendant's sense of self resulted in a "break down in her ability to reason and control her feelings."

Although these facts indeed present a "pathetic picture," *Nelson, supra,* 155 *N.J.* at 516, 715 *A.*2d 281 (Handler J., concurring & dissenting), and may help to explain defendant's conduct, they do not excuse her heinous crimes, for which she must be punished. In stating that the retributive value to be gained from executing defendant is unacceptably low, defendant is nonetheless responsible and culpable for the murders she committed. The State's expert denied that defendant experienced a total breakdown in her ability to make reasoned judgments, but that conclusion is consistent with defendant's lack of insanity. Defendant did not plead and could not have successfully maintained an insanity defense. That said, both experts agreed that defendant, at the least, "had an impairment of her judgment at the time because of her condition, which made her more vulnerable to a partial breakdown or an impairment of her judgment more than the average person."

The testimony of those expert witnesses implies that there is a spectrum of abilities in judgment and reason between the complete inability of the insane to the unimpaired functioning of the fully culpable. Stated differently, "moral responsibility is a continuum concept." Stephen J. Morse, "Excusing and the New Excuse Defenses: A Legal and Conceptual Review," 23 *Crime & Just.* 329, 397 (1998).

[R]ationality is distributed along a continuum in the population at large and among people who suffer from mental disorders. Depending on the type and severity of disorder and its signs and symptoms, various mental disorders may affect rationality to varying degrees. If rationality is the touchstone of legal responsibility, responsibility is also distributed along a continuum and legal accountability might be adjusted accordingly. In principle, therefore, there are degrees of partial responsibility....

[Stephen J. Morse, "Crazy Reasons," 10 *J. Contemp. Issues* 189, 211 (1999).]

Executions, our most extreme expression of indignation, cannot be carried out on a defendant whose irrationalities were exacerbated at the time of her criminal acts to such an extent as to undermine our confidence that she is fully culpable. If capital punishment is constitutional, it must be reserved for those defendants whose capacities allow them to be fully culpable, so that the death penalty can exact its intended retributive value. In *Atkins, supra,* the Supreme Court reiterated that the death penalty must be reserved for the "most deserving." —— *U.S.* at ——, 122 *S.Ct.* at 2251, 153 *L.Ed.*2d at ——. The Court stated that the crimes of a defendant sentenced to death must "reflect a consciousness materially more 'depraved' than that of any person guilty of murder.' " *Ibid.* (quoting *Godfrey v. Georgia,* 446 *U.S.* 420, 433, 100 *S.Ct.* 1759, 1767, 64 *L.Ed.*2d 398, 409 (1980)). The Court continued: "If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." *Ibid.* I reason similarly, for if the culpability of the average murderer is insufficient to invoke the death penalty as our most extreme sanction, then the lesser culpability of Nelson, given her history of mental illness and its connection to her crimes, "surely does not merit that form of retribution." *Ibid.*

### Deterrence

The execution of defendant would not achieve any significant deterrent effect, whether applied to her future behavior or that of others in similar circumstances.

[T]he concept of deterrence involves the notion of "individual deterrence"—that punishment will dissuade the offender from repeating his criminal acts. *State v. Ivan,* 33 *N.J.* 197, 162 *A.*2d 851 (1960). It also includes the principle of "general deterrence"—that punishment can "discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of [punishment] is likely to follow from [certain crimes]." *United States v. Bergman,* 416 *F.Supp.* 496, 499 (S.D.N.Y.1976); *State v. Wentworth,* 118 *N.H.* 832, 395 *A.*2d 858, 864 (1978).

[*In re C.A.H. and B.A.R.,* 89 *N.J.* 326, 334–35, 446 *A.*2d 93 (1982).]

Because defendant, who has waived her eligibility for parole, will spend the rest of her life in prison, the death penalty will not better protect society from the danger that she will murder again.

In respect of general deterrence, this Court has held that "the Legislature could reasonably find that the death penalty deters murder." *Ramseur, supra,* 106 *N.J.* at 180, 524 *A.*2d 188. However, even if the death penalty is justified generally by its allegedly deterrent effect on crime, it may not be imposed on a particular defendant to further the goal of general deterrence if that defendant's impaired capacities unacceptably diminish the retributive value to be gained from her execution. A defendant cannot be used as an example to others, through her execution, if it is unjust to put her to death because of her lessened culpability. *Cf.* H.L.A. Hart, *Prolegomena to the Principles of Punishment, in* Punishment and Responsibility 1–27 (1968) (arguing that general deterrence justifies practice of punishment, but allocation of punishment on specific occasion must be deserved).

Exempting this capital defendant from execution does not detract from any deterrent effect the death penalty might have. Our view is based on defendant's seriously impaired ability to use reason and judgment on the day of the murders, due to her particular history of mental illness in conjunction with the circumstances surrounding her actions. Moreover, fear of the death penalty cannot provide a deterring reason to similarly-situated persons moved by irrational and delusional motives. Eliminating defendant's death-eligibility will not lessen the death penalty's deterrent effect on those capable of weighing the costs of their criminal acts. One who is not suffering from severe mental illness who murders law enforcement officers is still subject to the death penalty.

### The State's Concern

The State argues that finding the death penalty unconstitutional as applied to Leslie Nelson would involve the Court's re-weighing of all aggravating and mitigating factors. However, it is defendant's diminished rationality and culpability that constitutionally

bar her execution. My view is not based on a reweighing of the totality of aggravating and mitigating factors, but rather, on a belief that the State's interest in carrying out death sentences is not satisfied by the execution of this defendant because of her lessened culpability, regardless of the weight of the aggravating factors.

This approach is analogous to decisions by other courts that hold that execution is an unconstitutional punishment for defendants whose reasoning capacities render them less than fully culpable for their crimes. See *Atkins, supra*, —— *U.S.* at ——, 122 *S.Ct.* at 2252, 153 *L.Ed.*2d at —— (the Eighth Amendment prohibits execution of mentally retarded persons); *Thompson v. Oklahoma*, 487 *U.S.* 815 838, 108 *S.Ct.* 2687, 2700, 101 *L.Ed.*2d 702, 720 (1988) (finding that the Eighth Amendment prohibits execution of person who committed offense before turning sixteen years old) (plurality opinion); *Van Tran, supra*, 66 *S.W.*3d at 792 (holding that execution of mentally retarded person violates Tennessee Constitution); *Fleming v. Zant*, 259 *Ga.* 687, 386 *S.E.*2d 339, 342 (Ga.1989) (stating that execution of mentally retarded person violates Georgia Constitution); *see also Penry v. Lynaugh*, 492 *U.S.* 302, 341, 109 *S.Ct.* 2934, 2958, 106 *L.Ed.*2d 256, 292 (1989) (Brennan, J., concurring and dissenting) (arguing that Eighth Amendment prohibits execution of mentally retarded persons), *abrogated by Atkins, supra*, —— *U.S.* ——, 122 *S.Ct.* 2242, 153 *L.Ed.*2d 335; *Koskovich, supra*, 168 *N.J.* at 552, 776 *A.*2d 144 (Zazzali, J., concurring) (observing that defendant's "young age, viewed in the context of his stunted emotional development, his traumatic childhood, and his condition at the time of the crime," raises concerns under New Jersey Constitution). As noted, the United States Supreme Court recently decided that the Eighth Amendment's prohibition of cruel and unusual punishment bars the execution of mentally retarded defendants. "Because of their disabilities in areas of reasoning, judgment, and control of their impulses, ... they do not act with the level of moral culpability that characterizes the most serious adult conduct." *Atkins, supra*, —— *U.S.* at ——, 122 *S.Ct.* at 2244, 153 *L.Ed.*2d at ——.

Those decisions imply that in some instances a defendant's diminished cognitive or reasoning capacities may bar the weighing of aggravating and mitigating factors because the defendant's diminished culpability, by itself, removes execution as a possible punishment. However, my position is distinct from the holdings of other courts because it addresses the death-eligibility under our State Constitution of only one defendant, as opposed to a class of defendants. My approach is specific to Nelson and based on her specific set of psychological problems and her condition during the circumstances of her crimes, all of which is fully documented in the record. If there was not substantial proof of serious mental illness, my view of this issue might be different. As a general rule, I believe that substantial documentation of mental illness is necessary to support a defendant's claim in such circumstances. That expectation should allay the concerns of those who would contend that the view expressed here would create an *open sesame* for defendants who now may seek to manufacture claims of mental illness.

Considering defendant's mental illness, evidenced by her partial breakdown of reason and judgment, as merely a mitigating factor does not adequately satisfy the concerns of article 1, paragraph 12 of the New Jersey Constitution. I share Justice Brennan's view that where a defendant's impaired capacities render the defendant less culpable for his or her actions, balancing that defendant's mental problems against other factors does not satisfy constitutional concerns. *Penry, supra,* 492 *U.S.* at 347, 109 *S.Ct.* at 2962, 106 *L.Ed.*2d at 296–97 (Brennan, J., concurring and dissenting). Aggravating factors, while increasing our outrage as citizens in response to a crime, are irrelevant for capital sentencing purposes if the culpability of a defendant, at the time of his or her crimes, is sufficiently diminished. In respect of the mentally retarded, Justice Brennan wrote:

> At sentencing, the judge or jury considers an offender's level of blameworthiness only along with a host of other factors that the sentencer may decide outweigh any want of responsibility. The sentencer is free to weigh a mentally retarded offender's relative lack of culpability against the heinousness of the crime and other

aggravating factors and to decide that even the most retarded and irresponsible of offenders should die.

. . .

Lack of culpability as a result of mental retardation is simply not isolated at the sentencing stage as a factor that determinatively bars a death sentence; for individualized consideration at sentencing is not designed to ensure that mentally retarded offenders are not sentenced to death if they are not culpable to the degree necessary to render execution a proportionate response to their crimes.

[*Penry, supra*, 492 *U.S.* at 347, 109 *S.Ct.* at 2962, 106 *L.Ed.*2d at 296–97 (Brennan, J., concurring and dissenting).]

Similarly, the Tennessee Supreme Court has stated:

[T]he jury's consideration of mental retardation as a mitigating factor is by itself insufficient to address the concerns protected under the Eighth Amendment or [the Tennessee Constitution]. In such circumstances, evidence of mental retardation would only be weighed in conjunction with one or more aggravating circumstances, such as the heinousness of the crime or defendant's prior record. . . . In sum the limitations and impairments associated with mental retardation warrant more consideration than simply allowing the evidence to be weighed in the mix of aggravating and mitigating circumstances.

[*Van Tran, supra*, 66 *S.W.*3d at 809–10.]

I agree with Justice Brennan's observation that the state's interest in exacting retribution by an execution is constitutionally inadequate if a defendant's reasoning and moral capacities are sufficiently diminished, regardless of the aggravating factors that affect our overall evaluation of a crime's despicable nature. Indeed, "[b]y killing two police officers in the line of duty, defendant committed one of the worst crimes known to our law." *Nelson, supra*, 155 *N.J.* at 516, 715 *A.*2d 281 (Handler, J., concurring and dissenting). Despite that fact, the aggravated nature of defendant's crimes cannot be invoked to justify her execution. Defendant's mental illness and her concomitant lessened culpability preclude our most extreme form of punishment as a matter of principle.

In sum, the psychiatric testimony presented by both the State and defendant depicts a seriously disturbed and depressed person who has suffered from serious mental illness throughout her life. The experts described a person thoroughly obsessed with her status as a female and with her guns, which she viewed like her surrogate children. Tragically unaware of the extent of defen-

dant's psychological problems, the police, in carrying out their duties, threatened both things defendant valued most: her ability to maintain her appearance as a woman and her possession of guns. Both experts agreed that defendant experienced at least an impaired ability to use reason and judgment because of the impending loss of all that she found meaningful to her life. Nelson's impaired state resulting from her long history of mental illness and psychological problems, and its close connection to her bizarre and violent reaction to the police that day, undermine our confidence that she is fully culpable. The State's legitimate penological interests in executing defendant are not adequate to satisfy the concerns of our State Constitution's prohibition against cruel and unusual punishment.

Justice LONG joins in this opinion.

LaVECCHIA, J., concurring, in part, and dissenting, in part.

I concur in the judgment of the Court that reverses defendant's death sentence based on error in the trial court's handling of ambiguity in the verdict sheet. Because I do not view any of the other alleged trial errors to constitute a basis for reversal, I cannot join in Section III of the majority's holding.

The majority declares improper the prosecutor's references to one expert witness of defendant (Dr. Weiss) as "partisan," and as "wearing the same color jersey as the other people on Leslie Nelson's team," and referring to another defense expert witness (Dr. Gelles) as "[going] over the edge a little bit." Those comments are viewed as amounting to prosecutorial misconduct that so exceeded the bounds of propriety that defendant was denied a fair penalty trial. Because this is a capital case, the majority gives the benefit of the doubt to defendant. Arguably the capital setting of this matter will circumscribe future applications of the majority's restrictive approach to an advocate's fair comment on matters clearly in the record. That said, I respectfully dissent.

Although generally limited to commenting on the evidence and drawing reasonable inferences supported by the proofs, prosecu-

tors are expected to "make powerful arguments in summations to the jury .... [and] are thus afforded considerable leeway in making closing arguments." *State v. Koskovich,* 168 *N.J.* 448, 489, 776 *A.*2d 144 (2001) (citing *State v. Chew,* 150 *N.J.* 30, 84, 695 *A.*2d 1301 (1997)), *cert. denied,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999); *see also State v. Smith,* 167 *N.J.* 158, 177, 770 *A.*2d 255 (2001) ("We have consistently recognized that prosecutors are afforded considerable leeway in their closing arguments." (citations omitted)). As Justice Clifford observed in his widely cited dissent in *State v. DiPaglia:*

> Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.
>
> [64 *N.J.* 288, 305, 315 *A.*2d 385 (1974) (Clifford, J., dissenting) (citations omitted).]

It is beyond cavil that a prosecutor may not make inaccurate legal or factual assertions during a trial, nor are prosecutors permitted to "cast unjustified aspersions on the defense or defense counsel." *Smith, supra,* 167 *N.J.* at 177, 770 *A.*2d 255 (citing *State v. Frost,* 158 *N.J.* 76, 86, 727 *A.*2d 1 (1999)). However, those limitations do not prevent a prosecutor from speaking frankly about the interest and bias of a defense witness. See *State v. Timmendequas,* 161 *N.J.* 515, 593, 737 *A.*2d 55 (1999), *cert. denied,* — *U.S.* —, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001) ("It is not improper for the prosecution to suggest that the defense's presentation was imbalanced and incomplete."). As long as a prosecutor's comments are based on the facts in the record and reasonable inferences that follow, "what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" *Smith, supra,* 167 *N.J.* at 178, 770 *A.*2d 255 (quoting *State v. Johnson,* 31 *N.J.* 489, 510, 158 *A.*2d 11 (1960)). Thus, we distinguish between a prosecutor discrediting the motivation of defense witnesses based only on the prosecutor's opinion without any support in the record, and a prosecutor's comment to that effect when supported by inferences reasonably drawn from the record. *Smith, supra,* 167 *N.J.* at 177–78, 770 *A.*2d 255.

In this case, the objected-to comments concerning the experts have support in the record. With respect to Dr. Weiss, the prosecutor asked him on cross-examination:

You considered yourself when you wrote the report part of a defense team in connection with this matter; is that right?

In response to that question, Dr. Weiss answered "Yes." There was no objection to this question and answer at trial; moreover, defendant's counsel referred to Dr. Weiss's "team" testimony in his own closing. Nonetheless, the majority concludes that the prosecutor's comment constitutes reversible error.

The majority also finds that despite the prosecutor's reference to another defense expert, Dr. Gelles, as "very competent" and "very credible," it was inappropriate for the prosecutor in closing to have suggested that Dr. Gelles inappropriately stretched his testimony when he described Officer John McLaughlin as "impulsive." As with the prior comments discussed, there was a basis in the record to support that statement by the prosecutor, rendering the comment fair. During cross-examination of Dr. Gelles, the prosecutor elicited the concession that in fact Dr. Gelles had no idea whether McLaughlin raced to the top of the stairs "impulsively." Dr. Gelles had asserted repeatedly that McLaughlin was unaware of the danger at the top of the stairs as he raced up toward defendant. In addition to the aforesaid concession, Dr. Gelles also conceded that he knew that McLaughlin had his hand on his weapon as he ran up the stairs. Perceiving contradictions in the expert's testimony, the prosecutor did not engage in misconduct by suggesting to the jury in closing that Dr. Gelles might have gone "over the edge a little bit" in an effort to provide testimony favorable to defendant. I would not equate this prosecutor's comments with "improper methods that result in wrongful conviction." *Smith, supra,* 167 *N.J.* at 177, 770 *A.*2d 255.

The allegedly prejudicial comments in this case are not close to the boundaries of impropriety previously established by this Court. See *State v. Rose,* 112 *N.J.* 454, 518–19, 548 *A.*2d 1058 (1988) (finding prosecutorial misconduct constituting reversible error where prosecutor, with no support in record, implied in

summation that expert's testimony was fabricated or contrived with assistance from defense counsel). *See also Frost, supra,* 158 *N.J.* at 86, 727 *A.*2d 1 (referring to prosecutor's comments as improper for suggesting that defense counsel's closing arguments were "lawyer talk," and that defense counsel hoped that jurors had a "bad taste in [their] mouth towards [police] officers"); *State v. Moore,* 122 *N.J.* 420, 461–62, 585 *A.*2d 864 (1991) (holding it improper for prosecution to refer to defense expert as "professional bleeding heart who was indeed duped by the defendant"); *State v. Marquez,* 277 *N.J.Super.* 162, 172, 649 *A.*2d 114 (App.Div.1994) (declaring it improper for prosecutor to comment without basis that defendant's attorney had scripted expert witnesses' testimony), *certif. denied,* 141 *N.J.* 99, 660 *A.*2d 1198 (1995).

The prosecutor did not refer to defense counsel in his summation and the majority stretches when reading into the criticism of the experts' testimony a suggestion of improper conduct by defense counsel. That significant feature distinguishes this case from others that involved unfair and prejudicial prosecutorial comment, as does the fact that here there was a basis in the record for each of the prosecutor's comments concerning both witnesses. The "team" descriptor used by the prosecutor concerning Dr. Weiss was brought into play by the witness himself. And, as noted, there was a basis in this record to call into question before the jury the reliability of Dr. Gelles's testimony. The comments constituted neither bald opinions by the prosecutor, nor negative aspersions against defense counsel.

Lastly, I would note that the prosecutor's summation comments about Dr. Sadoff, a prosecution witness, also were not inappropriate for contrasting his testimony with that of the defense experts. Dr. Sadoff had testified that he did not consider himself part of the "prosecution team" and that testimony was referenced by the prosecutor in his closing. The prosecutor was entitled to highlight that Dr. Sadoff's testimony was balanced in response to summation comments by defense counsel that described Dr. Sadoff as "the prosecutor's $400–an–hour psychiatrist."

The majority's paring of the prosecutor's ability to critique the record and to build argument inappropriately circumscribes the prosecution's capability to forcefully and fairly state its case based on the record and the reasonable inferences to be drawn therefrom. I cannot join in the majority's holding that this case presented a circumstance where an unjust verdict occurred as a result of prosecutorial misconduct. Thus, I respectfully dissent.

Justice COLEMAN joins in this opinion.

*For reversal and remandment*—Justices STEIN, COLEMAN, LONG, LaVECCHIA and ZAZZALI—5.

*For concurrence*—Justices LONG and ZAZZALI—2.

*Concurring in part; dissenting in part*—Justices COLEMAN and LaVECCHIA—2.